259 F.2d 151
 SELBY-BATTERSBY and COMPANY, and Associated Builders and
Contractors of Maryland, Incorporated, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and Baltimore
Building and Construction Trades Council, Intervenor.
 No. 7600.
 United States Court of Appeals Fourth Circuit.
 Argued June 3, 1958.
Decided Sept. 12, 1958.
 
 Earle K. Shawe and Sidney J. Barban, Baltimore, Md. (William J. Rosenthal, Wilson K. Barnes, and Anderson, Barnes, Coe & Morrow, Baltimore, Md., on brief), for petitioners.
 William J. Avrutis, Atty., N.L.R.B., Washington, D.C. (Jerome D. Fenton, Gen. Counsel; Thomas J. McDermott, Assoc. Gen. Counsel; Marcel Mallet-Prevost, Asst. Gen. Counsel, and Arnold Ordman, Atty., N.L.R.B., Washington, D.C., on brief), for respondent.
 Thomas E. Bracken, Baltimore, Md. (Christopher H. Foreman; Callegary, Bracken & Callegary, Baltimore, Md.; Martin F. O'Donoghue and Thomas X. Dunn, Washington, D.C., on brief), for intervenor.
 Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit judges.
 HAYNSWORTH, Circuit Judge.
 
 
 1
 Three local unions, the parent Internationals and the Baltimore Building and Construction Trades Council, with which the Locals were affiliated, were charged with violations of 8(b) of the Labormanagement Relations Act. 29 U.S.C.A. 158(b). After the presentation of the case for the General Counsel in a hearing before a Trial Examiner, the Internationals and the Locals entered into a settlement stipulation with the General Counsel. Further hearings were held as to the Baltimore Building and Construction Trades Council, which denied responsibility for the conduct. The Trial Examiner concluded that the Council was responsible for the conduct and that it had violated 8(b)(1)(A), 8(b)(2) and 8(b)(4)(A) of the Act. He recommended an appropriate cease and desist order directed to the Council. The Board, however, held that the facts did not support the conclusion that the conduct was attributable to the Council, and dismissed the complaint as to the Council.[1] The case is brought here upon the petition of the charging parties.
 
 
 2
 The controversy grew out of a strike against a subcontractor, employing only union labor, who declined to sign a contract prohibiting its doing work for 'open shop' general contractors. An appraisal of the role of the Council requires consideration of the events and circumstances which led to the strike.
 
 Background
 
 3
 Under the Constitution of the Building and Construction Trades Department, AF of L-CIO, it has chartered some nineteen international unions and many state and local councils. Each council is composed of delegates from affiliated local unions, chartered by the Internationals, within the area of its jurisdiction, and the business agents of the affiliated Locals constitute the Executive Committee of the Council. The Council is the agency upon which is placed primary responsibility for arganizing workers in the construction trades, and it is intended to coordinate the efforts of the Locals and lend assistance to them. The Constitution of the Department expressly provides that no local union shall 'be allowed to inaugurate strikes without the local council's consent.'
 
 
 4
 The Constitution and By-laws of the Baltimore Building and Construction Trades Council incorporate the principle, long the chief organizational weapon in the construction trades, that, 'No member of any affiliated union will be allowed to work on a job where there are non-union men of any craft at work, except by special dispensation by the Council * * *.' This principle was not being effectively enforced in Baltimore, however, and in 1949 union general contractors began to complain to Frank Clark Ellis, President of the Council, that union subcontractors were working for open shop general contractors. The contracts of the general contractors required that they accept bids from union subcontractors only, while their open shop competitors had the advantage of bids from both union and non-union subcontractors. Ensuing discussions and warnings finally culminated in 1953 in a strike of the employees of union subcontractors on a construction project of open shop general contractors. The Council was charged with unfair labor practices in connection with that strike; the Board dismissed the charges, Baltimore Building and Construction Trades Council, (Stover Steel Service) 108 NLRB 1575, but this Court set aside the order of the Board, Piezonki d/b/a Stover Steel Service v. National Labor Relations Board, 4 Cir., 219 F.2d 879, holding the strike to have been in violation of 8(b)(4)(A) of the Act, 29 U.S.C.A. 158(b)(4)(A).
 
 
 5
 In the interim between the decision of the Board and that of this Court in the Stover Steel case, the ephemeral victory before the Board was cheered by the Business and Construction Trades Department in its October 1954 bulletin as validation of the traditional organizing methods of the councils. The Baltimore Council, in the same month, employing the 'same methods as we won with in the Stover Steel case,' called another strike of union employees of subcontractors working for an open-shop general contractor, Dominion Contractors. The Dominion strike was halted by an injunction, and Ellis appealed to the Department for legal and financial assistance, explaining, 'We just can't let this organizing method go down the drain.'[2]
 
 
 6
 'The Standard Agreement'
 
 
 7
 On December 3, 1954, Ellis, for the Council, again sought assistance from the Department, requesting that a representative of each International be sent to Baltimore to help in the elimination of the 'deplorable' open shop conditions in that area. Frank Bonadio, Secretary-Treasurer of the Department, after further correspondence and conferences with Ellis, requested each International to send a representative to Baltimore to attend a series of meetings, arrangements for which had been made by Ellis, and to provide continuing attention and advice. Bonadio, himself, attended, and presided at, the first series of meetings, principally for the purpose of achieving more complete cooperation among the Baltimore Locals. He had been concerned over the withdrawal from the Council of a large Carpenters Local, and he wanted to effect its reaffiliation.
 
 
 8
 The International representatives, sent to Baltimore for the purpose, first met together on January 6, 1955, and, then, with the business agents of the Baltimore Locals. The next day the combined group met with a committee representing union contractors. It was agreed at these meetings that, at the outset, greater cooperation could be effected if the movement was led by the International representatives, rather than the Council or the business agents of the Locals. Each business agent present agreed to adopt and execute any plan of action the International representatives might agree upon, and a subsequent meeting between representatives of employers and the International representatives, collectively referred to as the 'Joint Conference Group,' was scheduled. This group on March 24, 1955 agreed upon an adaptation of a contract previously used in Chicago and which they called 'The Standard Agreement,' as the means of eliminating the open shop contractors. The Standard Agreement contained provisions prohibiting the employer from contracting for work with any other contractor, if the other contractor was not a party to the agreement and permitting the withdrawal of union men from any job if non-union men were engaged in construction work on the project. During the preceding summer Ellis had attempted to persuade The Tile, Terrazzo and Marble Contractors Association to accept a contract with similar provisions. Timely notice of contract change had not been given, however, and he was unable to insist upon it at that time.
 
 
 9
 The Council had no representation, as such, in the Joint Conference Group. There was testimony that Ellis, President of the Council, sought to attend one of the meetings, but was excluded. It is clear, however, from a tentative draft of The Standard Agreement, circulated by the employer members of the Group to all members of their association of employers, that it was first contemplated that the Council would sign the agreement as the representative of the Baltimore Locals. The autonomy of each Local was such that each had the right to determine for itself whether or not it was to be bound by any agreement; some local were not represented by the Council, and some members of the Board were opposed to the Council's participation in the agreements. The Council did not become a formal party to The Standard Agreements.
 
 
 10
 The Locals, as the Council, had no representation, as such, on the Joint Conference Group, but when the Group finally settled upon the form of The Standard Agreement it reorganized itself into a Joint Conference Board, composed of the same members as the Group, but with the addition of the business agents of the Locals subscribing to the agreement as alternates for the International Representatives. Many of the International Representatives were on temporary assignment in Baltimore, and it was contemplated that their work on the Board would be taken over gradually by their alternates. Ellis, President of the Council, and other business agents who were members of the Executive Committee of the Council thus became alternate members of the Board.
 
 Implementation Of The Standard Agreement
 
 11
 Belief in the effectiveness of The Standard Agreement as an organizing weapon arose out of the fact that some trades in Baltimore, among them, terrazzo mechanics and helpers, were completely organized. If open shop general contractors could be deprived of their services, it would be difficult or impossible for them to bid upon construction projects where those skills were required. It was hoped that such pressures would compel open shop general contractors to capitulate to union demands, forcing their own employees to become members of the union. If the open shop general contractors could be forced, by this means, to accept The Standard Agreement, non-union subcontractors would be confronted with the alternative of capitulation or liquidation. The purpose of The Standard Agreement required that the pressures behind it be directed against those union subcontractors who employed workers in the fully organized trades, as the terrazzo mechanics and helpers, and, if the purpose was to be accomplished it was essential that each employer of those trades be brought into compliance or put out of business.
 
 
 12
 Negotiations for a new contract for a period beginning April 1, 1955 with The Tile, Terrazzo and Marble Contractors Association covering the members of Tile and Terrazzo Workers Local No. 4, affiliated with Bricklayers, Masons and Plasterers International Union of America, began in January 1955. Ellis, who in addition to his office as President of the Council was business agent of Local 4, with a committee from Local 4, conducted the negotiations. Economic matters were discussed at each meeting until late February when Ellis informed the representatives of the employers that any agreement must incorporate the terms of The Standard Agreement, which was then under consideration in tentative form by the Joint Conference Group and which was identical in substance to the proposal he had urged upon the same group of employers the preceding summer. The employers objected that the agreement would deprive them of substantial portions of their businesses, and the matter was the principal topic of discussion at subsequent meetings in March. All of these meetings were held in the offices of the Council, not those of Local 4.
 
 
 13
 On March 29, 1955, a committee of employer and union members of the Joint Conference Board met with a committee of the Tile Contractors in an unsuccessful effort to prevail upon the Tile Contractors to accept the agreement. At meetings called by Ellis and held on April 5 and 8, union officials[3] again urged acceptance of their terms. At the meeting of April 8, the employers were told that wages would be held at the current level if they accepted the terms of The Standard Agreement. Some of the employers present accepted this proposal, and a memorandum of the agreement was prepared and executed. The representative of Selby-Battersby & Company, a corporation, with its principal office in Philadelphia, engaged as a subcontractor in the installation of tile, terrazzo and resilient flooring and acoustical ceilings, demurred. He was told he would not have union men for his jobs if the agreement was not accepted. Ellis had telephone conversations with representatives of Selby-Battersby on April 11, 12, 13, 14, and on either the 15th or 16th, and on April 20, several officials of Selby-Battersby met in the Council's office with Ellis, Menotti, Boll and Poggioli. Ellis had told them previously that if they did not accept The Standard Agreement, he would have to tell union contractors who called him[4] that Selby-Battersby was non-union and the union contractors could not accept its bids. The officials of Selby-Battersby plead the their employees were all members of the unions and that curtailment of their job opportunities would be hurtful to their employees as well as to the company. Ellis repeated an earlier statement that he would have to leave out the name of Selby-Battersby in a directory of union contractors then being compiled by the Joint Conference Board, but the employer's officials were unyielding. One of them inquired what would happen next. Menotti said that was up to Ellis, and Ellis said, 'You don't have any men working for you. That is all.'
 
 
 14
 The tile and terrazzo employees of Selby-Battersby were told, in a meeting held the next morning, they could no longer work for Selby-Battersby. One of the employees objected that they were happy with their employment and were not concerned about the employees of other employers. They were then given the choice of doing as they were told or surrendering their union books and membership. They chose obedience.
 
 
 15
 On April 26, five days after the beginning of the strike, officials of Selby-Battersby met in Washington, at their request, with officials of the Bricklayers and Frank Clark Ellis. They sought unsuccessfully some moderation of the position of the unions, mentioning, during the course of the discussion, that when construction work was slack in Baltimore, they had, nevertheless, provided full employment for their employees by assigning them to shipyards where Selby-Battersby had contracts. The Secretary of the Bricklayers stated he felt it the duty of Mr. Ellis to 'get into the shipyard,' and Ellis expressed his intention of doing so. Selby-battersby employees in a shipyard in Baltimore were members of Resilient Floor Decorators Local 1754, an affiliate of the Carpenters, but the day after the charges were filed in this case they were advised by telegram from the president of their local that they were to work no longer for Selby-Battersby. The Trial Examiner found that this command, later countermanded, was given at the instance of Ellis and was a consequence of the conversation in Washington on April 26.
 
 Conclusion
 
 16
 The Trial Examiner concluded that the Council initiated the course of events and was the instigator of the conduct, and that it subsequently participated with the Joint Conference Board, in an unlawful joint venture. The Board disagreed because the evidence disclosed no consciousness of an unlawful purpose when the Council initiated the course of events and because it related all of the subsequent conduct of Frank Clark Ellis to his position as Business Agent of Local 4 Rather than to his office as President of the Council. The Board agreed with the Trial Examiner that the question is largely the legal conclusion to be drawn from substantially undisputed facts, but the Board fell into legal error when it ruled that the instigator of wrongful conduct is not responsible for the consequence if he does not realize at the time he acts that the intended conduct is wrongful.
 
 
 17
 It is true, as the Board points out, that the Council's letter of December 3, 1954, in which it asked for help in planning an organizing campaign, and subsequent correspondence discloses no conscious purpose to violate the law. Indeed, as the Board observed, until February 26, 1955 when the decision of this Court in the Stover Steel case was handed down, the earlier decision of the Board gave the Council basis for belief that its Stover Steel and Dominion 'organizational' strikes were legal. Responsibility of the instigator of conduct, however, does not turn upon such subjective considerations. An erroneous belief that the intended conduct is lawful, though it may be sincerely and not unreasonably held, is no defense to the ultimate actor, and it cannot permit one who instigates the conduct or who aids and abets the commission of the wrong to escape all responsibility.
 
 
 18
 The board does not suggest that the Trial Examiner was wrong in his conclusion that the Council was the instigator of the conduct. There is no reason to suppose that in requesting assistance in planning the campaign, the Council had in mind anything other than the exertion of pressure upon employers through some implementation of the principle in the Council's constitution that union men would not work with non-union men. Soliciting voluntary affiliation by employees of unorganized employers in not the traditional organizing means in the construction industry. The Council might have had in mind the Standard Agreement itself, for Ellis had proposed substantially the same thing to employers the preceding summer and it had been suggested in the meetings of January 6, 1954 before the agreement to permit the International representatives to take the lead in the planning stage. The problem was more effective cooperation between the Baltimore Locals, but whatever the details of the plan, it is clear that everyone contemplated that the ultimate sanction would be a strike, if its threat was not effective, to compel union employers to cease doing business with non-union contractors. The Council, at the time may have thought there was nothing illegal in such a strike, but since it was the natural consequence of the course of events it initiated, it cannot escape responsibility for it.
 
 
 19
 Moreover, the fact that Ellis, as he played his prominent role in the implementation of The Standard Agreement, did not announce that he was acting in his capacity as President of the Council, which was intended to be the principal beneficiary of the campaign, hardly leads to the conclusion that he was acting solely as Business Agent of Local 4, which would suffer loss in a strike but could gain no direct or immediate advantage if its strike succeeded in forcing workers in other trades into other locals. Clearly, he did speak as President of the Council when he told Selby-Battersby that if it did not accept The Standard Agreement, he would answer inquiries, addressed to the Council, of union general contractors by informing them that Selby-Battersby was non-union and thus ineligible to do subcontract work for them. It is difficult to see how it might be thought he did not speak in that capacity when, on April 20, he told representatives of Selby-Battersby they no longer had men working for them, for he spoke just after Menotti had said the next move was up to Mr. Ellis; he referred to the members of three different locals, and the Locals, under the Constitution of the Department, had no right to call the strike without the consent of the Council. The minutes of the Council disclose no formal action in that body, but when an officer addresses himself to the business of his office, it requires the plainest of words to disassociate his actions from the office.
 
 
 20
 Unquestionably, the Council, after initiating the program, transferred to the Joint Conference Group its responsibility for the detailed planning, and the Joint Conference Board, in which there was much antipathy toward the Council, was active in obtaining acceptance of The Standard Agreement, but nothing appears to suggest that provisions in the constitution of the Department were to be suspended or that the Council relinquished most of its functions. One of the aims and purposes of the movement was the rehabilitation of the Council, not its impotence or its demise, and the purpose was largely accomplished when the large Carpenters Local, about which Bonadio was concerned, did reaffiliate itself with the Council about October 1, 1955 paying all arrearages in its capitation tax. Nor was the Council otherwise inactive in its support of The Standard Agreement for the Engineers withdrew from the Council in the early fall of 1955 because they had been made to feel outcast in the Council because of the failure of the Engineers to subscribe to The Standard Agreement. The reaffiliation of the Carpenters Local and the withdrawal of the Engineers occurred some months after the strike, but there is nothing to suggest that the policy and attitude of the Council were changed in the interim.
 
 
 21
 Use of the Joint Conference Group in the planning stage seemed desirable in order to obtain the cooperation of Locals which were not affiliated with the Council, but it would seem reasonable to suppose that the Council retained something of its primary responsibility for organizing activity, its duty as the policeman of the jurisdiction and its control of the sanctions it found useful in backing its position. We think the record warrants the conclusion that the Council did retain responsibilities in these areas and, through its President, sought to discharge them. We need not decide whether the record requires that conclusion, however, for it is enough that the Council instigated the course of events which proceeded, for the benefit of the Council, to the climax which was contemplated from the beginning, and that it took no action to disavow or disassociate itself from the actions of a man who held the office of its President. As Judge Learned Hand said, in holding a union which induced another to engage in an unlawful strike equally responsible with the striking union (International Brotherhood of Electrical Workers, Local 501 v. National Labor Relations Board, 2 Cir., 181 F.2d 34, 38):
 
 
 22
 '* * * for he, who provokes or instigates a wrong, makes himself a party to the wrong, and is equally liable with the perpetrator. This was apparently settled as to civil liability at least as early as the third quarter of the eighteenth century: 'not only he who does an act, but who commands or procures it to be done' is trespasser. As the Restatement of Torts puts it: 'for harm resulting to a third person from the tortious conduct of another, a person is liable if he (a) orders or induces such conduct.' One striking illustration is inducing a breach of contract by the obligor; or inducing the termination of a terminable business relation, which would have otherwise continued. The same doctrine prevails as to criminal liability. The principle, long embodied in 2 of the Criminal Code (18 U.S.C.A. 2), which defines as a principal anyone who 'aids, abets, counsels, commands, induces, or procures' the commission of the forbidden act, goes back as far as Bracton, who at folio 142 declared: 'for it is colloquially said that he sufficiently kills who advises (praecipit) killing."
 
 
 23
 From what is before us, there seems little doubt that the conduct was in violation of the Act, but the Board limited itself to a consideration of Council's responsibility, and we restrict ourselves to the one question presented to us. The order of the Board will be set aside and the case remanded for such further orders as may be appropriate in the light of this opinion.
 
 
 24
 Order set aside and cause remanded to Board.
 
 
 
 [1]
 117 NLRB 366
 
 
 [2]
 The Dominion Contractors case was subsequently settled when the Council agreed to a Board order enforced by a consent decree in this Court
 
 
 [3]
 All of the employees of the Tile Contractors were not members of Local 4. Some of them were members of Tile and Marble Helpers and Polishers Local 29 while others were members of Terrazzo Helpers Local 81. Locals 29 and 81 were affiliates of International Association of Marble, Slate and Stone Polisheres, Rubbers and Sawyers, Tile and Marble Setters Helpers. Boll, a representative of that International and business agent of Local 29, Poggioli, business agent of Local 81, and Menotti, international representative of the Bricklayers, in addition to Ellis, were the union officials present
 
 
 [4]
 Such inquiries were frequently received by him as President of the Council