**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL UNION NO. 751, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL-CIO, et al., Respondents.**

**No. 16676.**

United States Court of Appeals Ninth Circuit.

Dec. 28, 1960.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Duane B. Beeson, Allison W. Brown, Jr., Attys., N.L.R.B., Washington, D. C., for petitioner.

Charles P. Scully, Victor Van Bourg, San Francisco, Cal., Francis X. Ward and William A. McGowan, Indianapolis, Ind., for respondents.

Before HAMLEY and MERRILL, Circuit Judges, and KILKENNY, District Judge.

HAMLEY, Circuit Judge.

The National Labor Relations Board here seeks enforcement of a cease and desist order directed against certain labor organizations and union officials. The order concerns an alleged product boycott of a kind proscribed by section 8(b)(4)(A) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158(b) (4) (A), as that section read prior to the 1959 amendment.[1]

The order is directed against Local Union No. 751, United Brotherhood of Carpenters and Joiners of America, AFL-CIO; North Coast Counties District Council of the United Brotherhood; California State Council of Carpenters; the United Brotherhood (International); E. A. Brown, Bryan Oldfield, and Joseph Cambiano.

These respondents contend that the order should not be enforced because (1) the Board lacks jurisdiction in the matter, (2) there is no outstanding controversy, (3) no statutory violation was established as to any of the respondents, and (4) the order is not limited in its application to the primary and secondary employers involved in the Board proceeding. The relevant facts, as stated in findings made by the Board examiner and adhered to by the Board, are summarized below.

The products involved in the asserted boycott are plywood doors manufactured by The Mengel Company. Mengel is a New Jersey corporation which manufactures wood products at various plants including one at Laurel, Mississippi.

On January 21, 1958, Local 751 adopted a group of resolutions relating to the relationship between Mengel and the International. In the preamble to these resolutions it is recited among other things that Mengel is not entitled to the use of the union label of the International,[2] that

1. Prior to the 1959 amendment (73 Stat. 542), section 8(b) (4) (A) of the act read as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \*

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person \* \* \*."

2. Section 60 of the general laws of the International provides for the use of the

the company is not fully organized into the International and does not have the necessary wages or working conditions to meet its minimum requirements, and that the use of products made by Mengel tends to lower the wages and working conditions in the door industry in California and ultimately for the construction carpenters in that state.

The resolutions which follow these recitals are to the effect that it is recommended that the State Council go on record protesting the use of such nonlabeled wood products, that the State Council notify all local unions and district councils in California " * * * to be on the lookout for the products of Mengle [*sic*] Door Company * * *," and that the State Council make a " * * * strong and forceful request to all Local Unions and District Councils to observe the policy of the Brotherhood and refuse to use such unlabeled products wherever they find them in the State of California."

A convention of the State Council was held from February 26 through March 1, 1958. Respondent Cambiano, a member of the executive board of the International, was chairman of this convention. Respondent Brown, district representative of the District Council, attended the convention as a delegate for the District Council. Respondent Oldfield, business agent of Local 751, attended as a delegate of that local. The January 21, 1958, resolutions of Local 751 were offered and considered at the convention of the State Council.

The latter organization then adopted a report of its resolutions committee, the material part of which is quoted in the margin.[3] The convention proceedings,

including this State Council resolution, were published in a booklet, copies of which were received by some Local 751 members. No further word from the State Council was received concerning this resolution.

Early in 1958 members of Local 751 were employed as carpenters by Oretsky and Wright, general contractors engaged in the construction of a building at Santa Rosa, California. In February of that year the contractors ordered 155 doors from United States Plywood Corporation. Plywood is a New York corporation engaged in the manufacture and distribution of plywood doors and allied lumber products in forty-five states. This company ordered the 155 doors from Mengel. Mengel shipped the doors from its Laurel, Mississippi plant and they reached the building site at Santa Rosa on May 12, 1958.

Ben Oretsky, one of the partners of the contracting firm, instructed foreman Barnes and carpenter Billigmeier, both of whom were members of Local 751, to begin hanging the doors on May 13. On that day, however, Oldfield came to the building site and told Oretsky that the doors could not be hung because they were not "union," as indicated by the fact that they did not bear the "carpenters' label." Oldfield also told Barnes and Billigmeier that "no union man is going to touch the doors." Because of Oldfield's statements none of the doors were hung on that day.

On the next day Oretsky handed Oldfield two affidavits in which it was recited that all doors produced and sold by Mengel were union-made in plants having contracts with international unions affil-

"carpenters' label." Paragraph N of that section reads:

"It shall be the duty of all District Councils, Local Unions and each member to promote the use of trim and shop-made carpenter work, hotel, bank, bar, store and office fixtures, and of church, school, household furniture, etc., and to make it generally known to the members of the Local Union that it is necessary to all mill and shop members and the United Brotherhood that products made

in factories, shops or mills where only members of the United Brotherhood are employed should be installed by fellow-members."

3. " * * * 'We concur in the intent of these Resolutions, but suggest that the body of same be referred to the General Executive Board of the Brotherhood for legal interpretation and a broad policy covering the use of the Label and to what extent we can go to enforce its use under the existing laws.' "

iated with the AFL-CIO. Oldfield immediately submitted these affidavits to Brown. Brown in turn took the matter up with the president of the State Council, one Bartalini, who declined to advise Brown how to proceed.

Brown then telephoned Cambiano, who told Brown that the affidavits were "no good." Cambiano then inquired, "Have you been enforcing the label in your area?" Brown replied, "Yes, we have." Cambiano then said, "Well, then so far as I am concerned, I see no reason to change your policy."

Brown reported this to Oldfield who in turn told Oretsky that because Oldfield's superiors considered the affidavits inadequate the doors could not be hung. The local attorney for Mengel then talked to Oldfield on the telephone. During this conversation Oldfield told the attorney that the doors could not be hung "because they were not union doors and did not bear the Brotherhood label of Carpenters and Joiners of America."

On May 16 Oldfield returned to the building site at the request of Walter Paxton, a member of Local 751 and a carpenter foreman having supervision over Barnes and Billigmeier. Oldfield told Paxton, Barnes and Billigmeier at that time that he had received word from those above him that "we couldn't hang the doors * * *." On that day or on May 19, Barnes and Billigmeier declined Oretsky's renewed request to hang the doors, Barnes stating that Oldfield had instructed him not to hang the doors.

On or about May 17, and at Paxton's request, Oldfield telephoned Maurice Hutchinson, president of the International, at the latter's office in Indianapolis, Indiana. Oldfield told Hutchinson of the problem at Santa Rosa and repeated the contents of the affidavit as Oldfield remembered it. Hutchinson expressed the view that the affidavit probably did not refer to the particular doors in question, but stated that "we will attempt to find out for you as quickly as possible." No further advice or information was received by Oldfield from Hutchinson or anyone acting on the latter's behalf.

On May 19, 1958, Mengel and Plywood filed charges with the Board alleging that since May 13, 1958, respondents and each of them had instructed the employees of Oretsky and Wright not to install Mengel doors because they did not bear the union label of the International. This was alleged to constitute unfair labor practices proscribed by the statute referred to above.

On May 23, 1958, four days after this complaint was filed, Oldfield went to the job site and told the carpenters that the application of the by-laws would no longer be held against them as far as hanging the doors in question was concerned, and that the doors could be hung. The work of hanging the Mengel doors was then undertaken and proceeded without interruption.

Oldfield's reference to the "by-laws" requires explanation. Under the constitution and laws of the International, district councils have the power to make trade rules for the government of the local unions in their respective districts. In conformity with this authority conferred by the International, the constitution and by-laws of respondent District Council provide that its rules supersede the by-laws of its affiliated locals.

Rule 26 of the District Council requires members to quit work when requested by the proper authorities. This rule also makes it the duty of any member knowing of a violation of the trade rules to prefer charges. Any member violating the rules is subject to a mandatory fine. Rule 28 of the District Council provides: "No member shall handle, install or erect any wood or wood products not made by members of the United Brotherhood of Carpenters and Joiners." [4]

---

4. These District Council rules had been specifically approved by the first general vice president of the International on May 22, 1953. Such approval was pursuant to the provisions of section 11B of the general laws of the International which makes it the duty of the first general vice president to approve or dis-

The decision to permit the hanging of the doors was reached during a conversation between Oldfield and Brown. Two reasons motivated this change of position. One was the commencement of the proceedings before the Board and the other was the fact that information was not readily available as to Mengel's union status.

The examiner concluded from these facts that each of the respondents violated section 8(b)(4)(A) of the act with respect to the work stoppage at Santa Rosa involving the hanging of the Mengel doors.

On the basis of these findings and conclusions, with which the Board concurred except in one particular noted in footnote 8 *infra*, the Board entered the order enforcement of which is now sought. In this order all of the respondents were ordered to cease and desist from inducing or encouraging the employees of Oretsky and Wright "or any other employer" to engage in a strike or concerted refusal to handle or work on materials, where an object thereof is to force or require Oretsky and Wright "or any other employer or person" to cease using or handling the products of Mengel "or of any other producer, processor, or manufacturer," or to force or require Plywood "or any other employer or person" to cease doing business with Mengel "or any other person." The respondents were also ordered to post notices that they would not engage in such practices in the future.

Respondents contend that the order in question represents an arbitrary and capricious and therefore unconstitutional exercise of jurisdiction. According to respondents this results from the fact that the Board is here exercising jurisdiction in an unfair labor practice case filed against labor organizations involving the building trades while following a policy of refusing to take jurisdiction in cases where such labor organizations are seeking the benefits of the act.

■ If and when the Board arbitrarily refuses to assert jurisdiction, a court order may be obtained requiring the Board to act.[5] But such a refusal, past or prospective, provides no ground for setting aside an otherwise valid order entered by the Board in a different proceeding. See National Labor Relations Board v. Reed, 9 Cir., 206 F.2d 184, 190.

■ Respondents argue that the order should not be enforced because there was no dispute pending at the time the complaint issued. As noted above, the charges were filed on May 19, 1958. The work stoppage was terminated on May 23. The complaint was issued by the Board on July 31, 1958.

Termination of the specific unfair labor practices which were made the subject of the complaint did not render the Board proceeding moot. See Local 1976, United Brotherhood of Carpenters and Joiners of America, A F L v. National Labor Relations Board, 357 U.S. 93, 97 note 2, 78 S.Ct. 1011, 1015, 2 L.Ed.2d 1186, 1193.

■ It is next contended that no statutory violation was established as to any of the respondents. In presenting this argument respondents deal separately with individual respondents or groups of respondents, the first being Local 751 and its business agent Oldfield.

It is asserted that the sole function of Oldfield was to determine whether or not the doors were produced by union labor—conduct which is not proscribed by the act.

The facts summarized above amply demonstrate that this was not Oldfield's only relevant activity. His conduct was

approve all District Council laws. Under section 60 of the International's constitution and laws this same official is in charge of the union label.

5. Hotel Employees Local No. 255, Hotel and Restaurant Employees and Bartenders International Union v. Leedom, 358 U.S. 99, 79 S.Ct. 150, 3 L.Ed.2d 143; Office Employes International Union, Local No. 11 v. National Labor Relations Board, 353 U.S. 313, 77 S.Ct. 799, 1 L. Ed.2d 846.

not limited to the obtaining of information. At the direction of his superiors he instructed members of Local 751 to refrain from hanging Mengel doors until and unless it was established that the doors bore the carpenters' label. Pursuant to his instruction the work of hanging these doors was stopped until Oldfield gave counter instructions. Local 751, which Oldfield represented as business agent, must share responsibility for this conduct. National Labor Relations Board v. International Longshoremen's and Warehousemen's Union, 9 Cir., 210 F.2d 581, 584.

It is further argued, however, that no work stoppage occurred, since the employees in question continued to work on all other parts of the construction project. But section 8(b)(4)(A) is not limited in its scope to labor practices which result in a complete shutdown of the secondary employer. Oldfield induced and encouraged the employees of Oretsky and Wright to engage in a concerted refusal in the course of their employment to use or otherwise handle the Mengel doors, the object being to force or require Oretsky and Wright to cease doing business with Mengel. Whether Oretsky and Wright were able despite this practice to proceed with other phases of the work is immaterial.

Finally, it is contended, the record does not support the order as it affects Local 751, Oldfield, and the other respondents because it was not shown that any of the respondents had a dispute with Mengel. But where the facts otherwise establish a secondary boycott practice violative of section 8(b)(4)(A) it is immaterial whether the union is engaged in a labor dispute with the primary employer.[6]

With regard to the District Council and Brown, its official representative, respondents present a different argument concerning the sufficiency of the record. They point out that Brown never had any contact with the secondary employer or its employees. They argue from this that Brown could not have "induced" or "encouraged" the employees of the secondary employer within the meaning of section 8(b)(4)(A).

It is not necessary to show that there was direct contact with the employees of the secondary employer in order to find that an individual or an organization engaged in practices proscribed by the statute. A labor organization which does not come into contact with a secondary employer or its employees may be held liable under section 8(b)(4)(A).[7] This being true, there is no reason why direct contact must be shown in order to charge a union official who, acting in the course of his employment, commits the union to a course of conduct violative of the statute.

It is further argued, however, that apart from the matter of personal contact Brown did not personally engage in any activity which makes him or the District Council vulnerable to a secondary boycott charge. It is urged in this connection that Brown did not instruct Oldfield as to the course of conduct to be followed and that no person was led to believe that he did.

The facts reviewed above show that Brown was instrumental in obtaining a ruling from Cambiano, a member of the executive board of the International, advising continuance of the union label policy. Brown, acting in the course of his duties as district representative, passed this ruling along to Oldfield. Old-

---

6. National Labor Relations Board v. Washington-Oregon Shingle Weavers' District Council, 9 Cir., 211 F.2d 149, 152; National Labor Relations Board v. Local 11, United Brotherhood of Carpenters & Joiners of America, AFL, 6 Cir., 242 F.2d 932, 934–35.

7. National Labor Relations Board v. International Longshoremen's and Warehouse-

men's Union, 9 Cir., 210 F.2d 581, 584; National Labor Relations Board v. Local 135, International Brotherhood of Teamsters, 7 Cir., 267 F.2d 870; Selby-Battersby & Co. v. National Labor Relations Board, 4 Cir., 259 F.2d 151; National Labor Relations Board v. International Brotherhood of Teamsters, 3 Cir., 249 F.2d 292.

field in turn reported back to Oretsky and later to Paxton that his "superiors" considered Mengel's affidavit inadequate. Here was direct participation by Brown in the chain of union command which pronounced and enforced the ruling which led to the secondary boycott. Brown's intimate connection with the transaction is further demonstrated by the fact that the decision to terminate the boycott and permit the hanging of the doors was made during a conversation between Oldfield and Brown.

■ What has just been said is sufficient to establish the accountability not only of Brown but of the District Council which he represented at the time. But the District Council's responsibility is also established by the fact that it had adopted the trade rules the enforcement of which led to the boycott. See Joliet Contractors Ass'n v. National Labor Relations Board, 7 Cir., 202 F.2d 606, 611, *certiorari denied*, 346 U.S. 824, 74 S.Ct. 40, 98 L.Ed. 349. It is unnecessary to decide whether the District Council is also chargeable by reason of the fact that Oldfield, whose conduct has been found to be violative of the statute, was the president of the District Council.

■ With regard to the State Council the examiner's finding of responsibility is predicated upon the following facts: (1) The 1958 convention of the State Council adopted a resolution concurring in the "intent" of the resolutions offered by Local 751; (2) that resolution was distributed to various members of Local 751; (3) Brown and Oldfield, whom we have found to be accountable under section 8(b) (4) (A), played prominent parts at the convention; (4) at the time of the convention Mengel doors had already been boycotted in Los Angeles; and (5) Bartalini, president of the State Council, was fully informed of the Santa Rosa work stoppage but declined to interfere with it or to disclaim the applicability of the resolution.

The resolution adopted at the state convention, while expressing concurrence in the "intent" of Local 751's resolution,

clearly withheld any recommendation or direction as to a course of action. On the contrary it was expressly provided therein that the matter be referred to the executive board of the International for "legal interpretation and a broad policy." Neither the adoption of such a resolution nor its distribution among the membership of Local 751 constituted an inducement or encouragement to engage in the boycott of Mengel doors at Santa Rosa.

Brown and Oldfield participated in the state convention only as delegates of the District Council and Local 751, respectively, and not as officials of the State Council. At that convention they did not engage in any activity prohibited by statute. The fact that they are personally accountable under section 8(b) (4)(A) because of their conduct elsewhere as District Council or Local 751 officials does not render the State Council liable under the statute. The fact that a boycott of Mengel doors was in progress at Los Angeles when the state convention was held is immaterial in view of the fact that the Los Angeles transaction has no bearing on the facts of this case. The failure of Bartalini, president of the State Council, to intercede in an effort to end the work stoppage is immaterial. On the other hand his specific refusal to advise Brown how to proceed evidences an intent to steer clear of the controversy. It is also significant that Bartalini was not personally charged with a violation of section 8(b) (4) (A).

We conclude that none of the facts upon which the examiner and the Board rely, nor all of them taken together, are sufficient to warrant a conclusion that the State Council shares responsibility for the secondary boycott at Santa Rosa.

■ There remains to be determined the sufficiency of the record to support the examiner's and Board's conclusion that the International and Cambiano, a member of its executive board, acted in violation of section 8(b) (4) (A).

When Oretsky sought to forestall the work stoppage by submitting certain

affidavits to Oldfield, the latter took them to Brown and he in turn telephoned to Cambiano. Cambiano's reaction amounted to approval of the stoppage as a means of enforcing the union label. It was on the basis of Cambiano's statement of position, as reported by Brown, that Oldfield rejected the affidavits and continued the work stoppage.

 The "union label" to which Cambiano made reference is provided for in section 60 of the general laws of the International, and Cambiano was acting for the International in approving Oldfield's method of enforcing the label. This alone is enough to charge the International with responsibility for the boycott of Mengel doors. But the International is also chargeable for the additional reason that rule 28 of the District Council, quoted above, had been approved by the first general vice president of the International, his approval being required by the general laws of the International. See footnote 4. It was rule 28, made binding upon Local 751, which Oldfield was seeking to enforce when he ordered the work stoppage at Santa Rosa. It has already been stated that the trade rules of the District Council as interpreted and applied by officials of the District Council and of Local 751 were violative of section 8(b) (4) (A).[8]

 The final contention advanced by respondents in this proceeding brings into question the scope of the Board order. The conduct proscribed by the order includes the inducement or encouragement of employees of Oretsky and Wright or "any other employer" to engage in practices an object of which is the forcing of Oretsky and Wright or "any other employer or person" to cease using Mengel doors, or the forcing of Plywood or "any other employer or person" to cease doing business with Mengel.

In our opinion the evidence amply establishes that all respondents except the State Council were carrying out a generalized scheme to prevent or discourage the use of Mengel doors by any secondary employer. Hence it was appropriate for the Board to prohibit those respondents from inducing and encouraging the employees of any secondary employer from engaging in acts an object of which is to force or require any such secondary employer to cease using, handling or otherwise dealing in the products of Mengel, or to force any employer or person to cease doing business with Mengel.

The order, however, also prohibits the inducement or encouragement of conduct which has for an object the forcing of such secondary employers to cease using not only Mengel products, but also those of "any other producer, processor, or manufacturer." The order also proscribes conduct aimed at forcing Plywood or any other employer or person to cease doing business not only with Mengel, but also "any other person."

In so far as the order purports to prohibit the inducement or encouragement of practices an object of which is to force any secondary employer to cease using, handling or otherwise dealing in the products of, or doing business with, primary employers other than Mengel, we do not believe that it finds sufficient support in the record. It is true that the general laws of the International relating to the union label and the trade rules of the District Council designed to enforce the union label are broad enough to apply with regard to other primary employers in addition to Mengel. But it is not established in this record that the policy outlined in these general laws and trade rules has actually been put into practice with regard to other primary employers. In this respect the order is too broad.[9]

8. We need not decide whether the International is also chargeable because of the provision in its general laws relative to the union label, quoted in footnote 2. In its order the Board found it unnecessary to adopt the examiner's apparent finding that the constitution and laws of the International are in themselves illegal.

9. The considerations which have led us to the conclusion stated on this branch of the case are outlined in Communications Workers of America, AFL–CIO v. Na-

The order of the Board is modified by deleting the State Council as a respondent against which the order runs, and by restricting its application, in so far as primary employers are concerned, to The Mengel Company. The form of notice to be posted is similarly modified. As modified the order is enforced.

tional Labor Relations Board, 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896; National Labor Relations Board v. International Longshoremen's and Warehousemen's Union, Local 10, 9 Cir., 283 F.2d 558; and National Labor Relations Board v. United Brotherhood of Carpenters and Joiners of America, AFL-CIO, Local 347, 7 Cir., 276 F.2d 694.