INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, LOCAL 613, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

ERIE TECHNOLOGICAL PRODUCTS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

International Union of Electrical, Radio and Machine Workers, Intervenor.

William P. Young, Secretary of the Department of Labor and Industry of the Commonwealth of Pennsylvania, Intervenor.

Nos. 13695, 13700.

United States Court of Appeals Third Circuit.

Reargued Oct. 8, 1963.

Decided March 9, 1964.

David S. Davidson, Washington, D. C. (Benjamin C. Sigal, Winn I. Newman, Washington, D. C., on the brief), for International Union of Electrical, Radio, & Machine Workers, Local 613, AFL-CIO.

John G. Wayman, Pittsburgh, Pa. (Irving Olds Murphy Gifford, Graham, MacDonald & Illig, Erie, Pa., Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on the brief), for Erie Resistor Corporation.

Norton J. Come, Asst. General Counsel, N. L. R. B., Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Marion L. Griffin, Attorney, N. L. R. B., Washington, D. C., on the brief), for respondent.

Before KALODNER, STALEY and SMITH, Circuit Judges.

WILLIAM F. SMITH, Circuit Judge.

This is a proceeding under Section 10 (e) and (f) of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 160(e) and (f). This matter was heretofore before this Court on petitions for review filed by the Company and the Union under subdivision (f), and a cross-petition for enforcement filed by the Board under subdivision (e). 303 F.2d 359. At that time we considered only the narrow question raised by the attack on the Board's conclusion that the Company had been guilty of certain unfair labor practices hereinafter enumerated. The judgment of this Court was reversed by the Supreme Court, N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308, and the proceeding was remanded for decision on the questions which remained undecided, including "the propriety of the remedy."

The facts are fully summarized in the earlier opinion of this Court and that of the Supreme Court. We repeat only those facts which we deem essential to an understanding of the questions now before us.

The Company and the Union had been parties to a collective bargaining agreement, which by its terms was to terminate on March 31, 1959. Approximately two months prior to the termination date the Union notified the Company of its desire to enter into negotiations in anticipation of a new contract. The negotiators for the respective parties met from time to time thereafter but were unable to reach full agreement. When the agreement terminated, a strike was called. It is here admitted that at its inception the strike was economic. When the strike was called there were

478 production and maintenance workers actively employed and 450 on layoff status; of those on layoff status, approximately 400 had no reasonable expectation of being recalled. All of the workers actively employed joined the strike.

During the early weeks of the strike the Company endeavored to maintain production operations by using clerks, engineers and other employees not within the bargaining unit. When its endeavors failed, the officers of the Company decided to hire replacements for the strikers and on May 3, 1959, so notified the Union members. The hiring of replacements commenced on May 11, and continued thereafter until June 24, 1959. The replacements included new employees, employees on layoff status, and returning strikers. When the applicants were accepted they were told that they would not be laid off or discharged by reason of the settlement of the strike.

When the negotiators met on May 11, 1959, the representatives of the Union were informed that replacements were being assured that they would not be discharged upon settlement of the strike. The Company, prompted by a desire to implement its assurances, proposed that the existing seniority system be so modified as to accord the replacements some form of preferential seniority. The subject was discussed at five sessions held between May 11 and May 28. The representatives of the Union remained adamant in their refusal to consider it on the ground that a preferential seniority system would be discriminatory and illegal. As negotiations advanced on other issues, it became evident that the proposed seniority plan was fast becoming the focal point of disagreement. The plan was nevertheless adopted by the Company on May 28, and the following day the strikers voted unanimously to continue the strike in protest.

The effects of the job assurance plan on the strike and the Union are adequately described in the opinion of the Supreme Court, 373 U.S. at page 224, 83 S.Ct. at page 1143, 10 L.Ed.2d 308.

We see no reason to repeat that description here. The strike ended on June 25, 1959, after the Union withdrew the picket line and offered to submit the seniority issue to the Board. Thereafter the strikers who had not been replaced were recalled by the Company in the order of seniority. By July 5, 358 production and maintenance workers had returned to work; this number increased to 442 by September 20. Thereafter, between September of 1959 and May of 1960, 202 employees were laid off for economic reasons; many of these were recalled strikers whose seniority was insufficient only because of the operation of the preferential seniority plan.

Shortly after the strike had terminated and the strikers were recalled to work, the Union filed a charge with the Board alleging that the superseniority policy adopted by the Company during the course of the strike constituted an unfair labor practice. The usual complaint was filed and a hearing thereon was held. The proceeding and the results thereof are discussed in the opinion of the Supreme Court at pages 224–227 of 373 U.S., at pages 1143–1144 of 83 S.Ct., 10 L.Ed.2d 308. The Company and the Union entered into a new collective bargaining agreement on July 17, 1959, and contemporaneously therewith executed an agreement which provided, among other things, "the company's replacement and job assurance policy should be resolved by the National Labor Relations Board and the federal courts but was to remain in effect pending final disposition."

The Board found: first, that the conduct of the Company was discriminatory and therefore constituted an unfair labor practice within the meaning of § 8(a) (3) and (1) of the Act, 29 U.S.C.A. § 158 (a) (3) and (1); second, that Company's insistence upon the seniority plan was tantamount to a refusal to bargain and an unfair labor practice within the meaning of § 8(a) (5) of the Act, 29 U.S.C.A. § 158(a) (5); and third, that the said conduct converted the strike into an unfair labor practice strike as of

May 29, 1959. The Board found further that the Company's unfair labor practice prolonged and aggravated the strike and that the strikers who had been replaced after May 29 were entitled to reinstatement and reimbursement for any pay loss suffered. The other findings of the Board are not relevant to the questions now before us.

The Company challenges as erroneous the Board's conclusion that the strike, initially undertaken for economic reasons, was converted to an unfair labor practice strike as of May 29, 1959, and that the unfair labor practice aggravated and prolonged the strike "despite a narrowing of the parties' disagreement on other issues." It is argued that the strike continued as an economic one until June 25, 1959, when it was terminated. The adoption of this argument would defeat those provisions of the final order, infra, which direct the reinstatement of certain employees with back pay.

■ It appears from the evidence, which the Board found credible, that on or about May 29 the seniority plan adopted by the Company was the main point of disagreement and a serious obstacle to the settlement of the dispute. In fact, it was the conduct of the Company which prompted the members of the Union to continue the strike in protest against the plan. We are of the view that the conclusion of the Board is amply supported by this and other evidence in the record which we find substantial. The Union argues, contrary to the Board's conclusion, that the strike was converted to an unfair labor practice strike on May 11. The argument is without merit.

■■ It is settled law that where a strike, undertaken for economic reasons, is later converted into an unfair labor practice strike by the unlawful conduct of the employer, the employer may be held responsible for the consequences. Where, as here, his conduct results in a prolongation of the strike, he may be required, on order of the Board, to reinstate the strikers with back wages, less the amounts earned by them while on strike. General Drivers and Helpers Union, Local 662 v. N. L. R. B., 112 U.S.App.D.C. 323, 302 F.2d 908, 911 (1962), cert. den. 371 U.S. 827, 83 S.Ct. 48, 9 L.Ed.2d 65; N. L. R. B. v. Wichita Television Corporation, 277 F.2d 579, 584, 585 (10th Cir. 1960), cert. den. 364 U.S. 871, 81 S.Ct. 113, 5 L.Ed.2d 93; N. L. R. B. v. Birmingham Publishing Company, 262 F.2d 2, 9, 10 (5th Cir. 1958); N. L. R. B. v. Giustina Bros. Lumber Co., 253 F.2d 371 (9th Cir. 1958). Whether the unfair labor practice of the employer is the sole cause or a substantial contributing cause of the strike's prolongation, the law is applicable. Ibid.

The final order of the Board enjoined the unfair labor practices and directed the Company to rescind its superseniority policy. The order further directed the Company to take the following affirmative action:

1. Offer reinstatement to the strikers not replaced prior to May 29, 1959, and make them whole for any loss of pay they may have suffered;

2. Offer reinstatement to all recalled strikers who were laid off solely as the result of the operation of the superseniority plan and make them whole for any loss of pay they may have suffered as a result of the lay-off; this directive is applicable only to those not otherwise subject to lay-off.

We have paraphrased only the directives relevant to the questions raised on this appeal. The other directives are in the usual form and need not be repeated.

■ The Company argues that the affirmative directives, to which reference is made in the preceding paragraph, should be denied enforcement because of the specific provision contained in the settlement agreement, supra. This argument is without merit. The strikers capitulated and agreed to return to work on June 29, 1958, when it was evident that the Company's job assurance policy was becoming effective. The Company

and the Union concluded a new collective bargaining agreement on July 17, and, contemporaneous therewith, agreed that the job assurance policy should be resolved by the Board and the federal courts, the policy to remain in effect pending final disposition. This agreement cannot be construed as a waiver of the employees' rights under the Act.

■ Section 10(c) of the Act, 29 (U.S. C.A. § 160(c), invests the Board with power to effectuate the policies of this remedial legislation and the concomitant authority "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate" those policies. National Labor Relations Board v. Seven-Up Bottling Co., 344 U.S. 344, 346, 347, 73 S.Ct. 287, 97 L.Ed. 377 (1953); Virginia Electric Co. v. National Labor Relations Board, 319 U.S. 533, 539, 540, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943). This power is exercised in vindication of the public policy as defined by § 1 of the Act, 29 U.S.C.A. § 151. Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 194, 195, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 364, 365, 60 S.Ct. 569, 84 L.Ed. 799 (1940). It follows that the rights of discriminatorily discharged employees under the statute are not subject to private adjustment. N. L. R. B. v. Threads Incorporated, 308 F.2d 1, 8 (4th Cir. 1962). Such an adjustment, if made, cannot bar the Board's exercise of its statutory authority.

■ The Company contends that it would be inequitable to enforce the affirmative directives under the facts and circumstances of this case. It is argued that the representatives of the Company acted in good faith in the honest belief that they had a right to adopt the job assurance plan to protect replacements. We are of the view that good faith, based upon an erroneous interpretation of the law, is not available as a defense. Old

King Cole v. N. L. R. B., 260 F.2d 530, 532 (6th Cir. 1958); Cone Brothers Contracting Co. v. N. L. R. B., 235 F.2d 37, 42, 43 (5th Cir. 1956), cert. den. 352 U.S. 916, 77 S.Ct. 214, 1 L.Ed.2d 122; Taylor Forge & Pipe Works v. N. L. R. B., 234 F.2d 227, 231 (7th Cir. 1956) and the cases therein cited; cert. den. 352 U.S. 942, 77 S.Ct. 265, 1 L.Ed.2d 238. An employer who pursues a course of conduct later determined to be an unfair labor practice does so at his peril. Ibid. We can perceive no inequity in the Board's directives. The equities in this case seem to favor the employees; it would be inequitable to require them to absorb pay losses ascribable to the unfair labor practice of the Company.

■ The final attack of the Company is levelled against that provision of the final order which directs the Company to bargain collectively with the Union as the exclusive representative of all employees in the unit. It is argued that "the broad general order to bargain with the Union is not appropriate, and * * * should be stricken. * * *" This argument runs counter to settled law. National Labor Relations Board v. Mexia Textile Mills, 339 U.S. 563, 567, 568, 70 S.Ct. 826 (1950); National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 271, 82 L.Ed. 831 (1938); N. L. R. B. v. United Brotherhood of Carpenters & Joiners, 321 F.2d 126, 129 (9th Cir. 1963); N. L. R. B. v. Local Union No. 751, etc., 285 F.2d 633, 638 (9th Cir. 1960); National Labor Relations Board v. Newspaper & Mail Del. Union, 246 F.2d 62, 65 (3rd Cir. 1957). An order of the Board, appropriate when made, "does not become moot because it is obeyed or because changing circumstances indicate that the need for it may be less than when made." National Labor Relations Board v. Pennsylvania Greyhound Lines, supra.

The prayers of the petition for review will be denied and the prayers of the petition for enforcement will be granted.