334 F.2d 1014
 Ross M. MADDEN, Regional Director of the Thirteenth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner-Appellee,
v.
GRAIN ELEVATOR, FLOUR AND FEED MILL WORKERS, INTERNATIONAL LONGSHOREMEN ASSOCIATION, LOCAL 418, AFL-CIO, and Seafarers' International Union of North America, Respondents-Appellants.
 No. 14361-14363.
 No. 14429.
 United States Court of Appeals Seventh Circuit.
 July 15, 1964.
 Rehearing Denied August 20, 1964 en Banc.
 
 COPYRIGHT MATERIAL OMITTED Irving M. Friedman, Harry G. Fins, Harold A. Katz, Chicago, Ill., for respondents-appellants.
 Julius G. Serot, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., William J. Cavers, Chicago, Ill., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, James T. Youngblood, Marvin Roth and Frank H. Itkin, Attys., N. L. R. B., Washington, D. C., for petitioner-appellee.
 Before DUFFY, SCHNACKENBERG and KNOCH, Circuit Judges.
 SCHNACKENBERG, Circuit Judge.
 
 
 1
 Consolidated in this court are four appeals from the district court brought by the Grain Elevator, Flour and Feed Mill Workers, International Longshoremen Association, Local 418, AFL-CIO, herein designated as the Local, and Seafarers' International Union of North America, herein designated as SIU, respondents, who were also respondents below as named in several petitions filed by Ross M. Madden, Regional Director of the National Labor Relations Board, for and on behalf of said Board, petitioner, for injunctive and other relief. Jurisdiction is based on Section 10(l) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 160(l), as amended, alleging violations of the secondary boycott provisions of § 8(b) (4) (i) and (ii) (B) of the Act, by SIU and the Local. Respondents filed an answer which denied that the Board or the district court had jurisdiction and denied various other material allegations of the petition.
 
 
 2
 On May 29, 1963, the court issued a temporary restraining order, which in substance enjoined respondents and all members acting in active concert with them from in any manner or by any means including picketing, orders, directions, instructions, requests or appeals inducing or encouraging any employee of Continental Grain Company (hereinafter called Continental) to refuse to handle any goods at the port of Chicago, where the object thereof was to force Continental to cease doing business with Upper Lakes Shipping, Ltd., a Canadian corporation (hereinafter called Upper Lakes).
 
 
 3
 The same day copies of the order were served upon Jack E. Connor, the president and business agent of the Local, and upon the employees of Continental, which then ordered several employees to load the Howard L. Shaw, a Canadian flag vessel owned by Upper Lakes. Continental had about 33 employees working that day who were all members of the Local[1] and 28 were present at a meeting in the lunchroom. While there Connor addressed the group, read the court's order, except the last paragraph, which was, however, read by the United States marshal who noticed the omission.
 
 
 4
 Upon the suggestion of Connor that the men might want to talk among themselves, the marshal and other non-members left the lunchroom and the meeting proceeded there. In a few minutes Connor came out of the meeting room and said that the men were going to vote. Connor returned to the meeting room and then came out and said that the men were not going to load the ship.
 
 
 5
 Thereafter the men refused to load the ship and the Shaw vacated the berth to let another steamer, the Allendale (not an Upper Lakes ship), in to load.
 
 
 6
 On May 31, 1963, the Board filed a petition in civil contempt against the Local and the court entered an order directing it to show cause why it should not be held in contempt of court. The Local answered the petition and demanded a trial by jury, which was denied. Following a bench trial, the court on June 4, 1963 entered findings of fact, conclusions of law and an order, which found the Local in civil contempt of court by reason of its disobedience and refusal to comply with the temporary restraining order. The Local was ordered to purge itself of contempt by obeying the order of May 29, 1963 and paying the sum of $1,000 by check or money order payable to the Treasurer of the United States.[2]
 
 
 7
 On June 14, 1963, the district court, after hearing evidence on the Board's petition, entered findings of fact and conclusions of law and an order granting a temporary injunction prohibiting SIU and the Local from encouraging or inducing employees to refuse to perform services, or from coercing Continental, if an object thereof was to force Continental to cease doing business with Upper Lakes, and directing the Local, its officers and agents, to withdraw all requests or appeals previously made to Continental employees to refrain from loading grain on ships of Upper Lakes and to advise the employees that they were free to perform any and all services for Continental.[3]
 
 
 8
 Following a hearing on a petition filed August 6, 1963 by the Board, the court on August 14, 1963, made findings of fact and conclusions of law, and entered an order adjudging the Local in contempt, and fining it $100 a day retroactively from June 17, 1963. The order provided that the fine would be remitted if the Local within 30 days purged itself, otherwise the fine would be $200 a day beginning August 14 for each day that it failed to comply.[4]
 
 
 9
 On August 20, 1963, the Local filed a motion to remit the fine on the ground that Connor, its president, had, by letter dated August 16, 1963, notified each member that all requests or appeals, if any, to employees of Continental to refrain from loading grain on Upper Lakes ships were withdrawn and that each was free to perform any and all services for Continental. This letter was read by Connor to the members at a special meeting.
 
 
 10
 On September 23, 1963, the Local filed a notice of appeal from the contempt order which had been entered on August 14.
 
 
 11
 On September 17, 1963, a hearing was held on the Local's August 20 motion. The court heard evidence and argument and entered its opinion, remarking that Connor's action did not purge the Local and that it did not constitute union action. Thereupon, on September 24, 1963, the court denied the motion to remit the fine, and it did not grant a trial by jury. It also entered an order nunc pro tunc as of September 17, 1963, which inter alia decreed that the daily fine of $200 imposed by the order of August 14, 1963 be increased to $500 a day from September 17, 1963, and that in all other respects the order of August 14, 1963 should remain in full force and effect.
 
 
 12
 The court also ordered on September 24, 1963 a suspension of the daily fines starting September 20, 1963, the date upon which the Shaw sailed from Chicago. The court on September 24 stated that the injunction order was still in effect and that fines thereinafter to be set would be measured at $3,000 a day when opportunity to demonstrate obedience to the court's order should present itself and "such opportunity is not carried forward. This is prospective."
 
 
 13
 On October 16, 1963, the Board's motion called the court's attention to the fact that the Local had been guilty of refusal by the employees to load the S. S. Erickson, another Upper Lakes vessel. The Local answered and again demanded a trial by jury, which was denied. The court heard evidence and, on October 31, 1963, ordered the Local to purge itself by complying with the order of June 14, 1963, and on refusal ordered reinstated the fine of $500 a day beginning October 29, 1962 and imposed a fine of $3,000 a day for October 4, 7, 11 and 26, 1963 (when the Erickson docked and Local 418 had not complied with the prior order of the court in regard to loading). The order further provided for the Local to file within 30 days from October 29, 1963 an appeal bond of $27,300 plus $500 for each day from the date of the order until the bond was posted, and lacking a bond all fines accrued should be due and payable.
 
 
 14
 The Local made a motion that the part of this order relating to the appeal bond be vacated, which motion was, on November 27, 1963, denied.
 
 
 15
 On December 2, 1963, the Local's notice of appeal from the order entered October 31, 1963 and the order entered November 27, 1963, was filed.
 
 
 16
 1. Respondents contend that the district court failed to comply with 28 U.S.C.A. rule 52(a), inasmuch as, according to respondents, the court made no findings of fact and conclusions of law when it entered the orders of September 24 and October 31. We disagree. The record is replete in this respect.[5]
 
 
 17
 (a) For instance we refer to parts of the record relating to the order of September 24, 1963. The stenographic transcript reveals a detailed analysis of the evidence and the court's findings of fact. It specifically found, as the result of a review of the testimony of various witnesses, that, on August 19, 1963, "nevertheless the men refused" to load the Shaw.
 
 
 18
 The court stated that in June 1963 it had found that there was in fact a secondary unlawful boycott, as a consequence of which an injunction issued, and subsequently thereto the court held the Local in contempt of court. The court then referred to the letter of Connor to the members of the union advising them that they were free to perform all services for Continental, but it did not hold that this letter was sufficient to purge each union member as an employee of Continental. It did hold that, in order for the fine to be remitted, each employee member must purge himself of contempt, and that the union, under its constitution and bylaws, would not be purged by the action of the president alone. The court found and held that Connor's conduct constituted an act of purging on his part, but that it did not constitute union action. Moreover, finding no organizational action by the union, the court said that it must find that the union had done nothing to purge itself of contempt in these proceedings "but, rather, has continued its conduct without change in an identical nature and in an identical manner with that conduct which existed prior to the citation for contempt and which resulted in the fine from which the union seeks relief."
 
 
 19
 The court also stated that they (the members) "while they approve of their prior secondary boycott activities, they, as individual union members, have done nothing to show this Court that their activity is no longer concerted or that they intend Jack Connor's present position also to constitute the action and the position of the labor union".
 
 
 20
 Accordingly, the court denied the motion to remit.
 
 The court added
 
 21
 "* * * I am still convinced that the conduct of these men is concerted action * * *."
 
 
 22
 (b) As to the order of October 31, 1963, the transcript reveals that the court dictated his findings and conclusions, which are reproduced verbatim.[6]
 
 
 23
 (c) We note the contention of respondents that the court, when entering the temporary injunction on June 14, 1963, made no findings or conclusions sufficient to establish jurisdiction, in view of this statement from Incres S.S. Co. v. International Maritime Workers, 372 U.S. 24, 27, 83 S.Ct. 611, 613, 9 L.Ed.2d 557:
 
 
 24
 "* * * The Board's jurisdiction to prevent unfair labor practices, like its jurisdiction to direct elections, is based upon circumstances `affecting commerce,' and we have concluded that maritime operations of foreign-flag ships employing alien seamen are not in `commerce' within the meaning of § 2(6), 29 U.S.C. § 152(6)."
 
 
 25
 However, the district court cited the "uncontradicted testimony" of the vice-president of Continental and a contract between Continental and Upper Lakes, as establishing
 
 
 26
 "* * * that a large amount of grain was to be shipped from Continental's Chicago elevators via foreign vessels to Canadian elevators for temporary storage. A substantial portion of that grain thereafter ultimately will reach overseas ports. Continental ships approximately one-fourth our national exports in grain, and though some of this is moved the Canadian elevator arrangement would require substantial rearrangement of other means of interstate movement of the grain. * * *"
 
 
 27
 Accordingly the court found "no question about the fact that [interstate] commerce is affected".
 
 
 28
 In the case at bar, no attempt is being made to regulate or to apply the Act to the "internal management or affairs" of the Upper Lakes ships; the injunction does not regulate the internal affairs of its ship. No conflict between American and Canadian policies can result from halting an illegal secondary boycott in this country, directed against an American employer by an American labor organization and involving employees working in a domestic plant of the American employer.
 
 
 29
 2. The Local based its demand for a jury trial on 18 U.S.C.A. § 3692, which provides:
 
 
 30
 "In all cases of contempt arising under the laws of the United States governing the issuance of injunctions or restraining orders in any case involving or growing out of a labor dispute, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the contempt shall have been committed.
 
 
 31
 "This section shall not apply to contempts committed in the presence of the court or so near thereto as to interfere directly with the administration of justice nor to the misbehavior, misconduct, or disobedience of any officer of the court in respect to the writs, orders or process of the court."
 
 
 32
 The Local contends that this case fulfilled each requirement necessary to come within the protection of § 3692; that it involves or arises out of a labor dispute regardless of the fact that the government is a party.
 
 
 33
 However, we note the following facts shown by the record:
 
 
 34
 Before the 1963 Great Lakes shipping season opened SIU asked a union convention to continue to support SIU in its dispute with Upper Lakes as they had done the prior year, when the Local members at Continental had refusal to load Upper Lakes ships; that the delegates to that convention, including those from the Local, pledged to continue such support; that following the convention, the Local conveyed this threat of work stoppages to Continental; and that thereafter, when Continental sought to load Upper Lakes ships, the Local made good its pledge to SIU and its threats to Continental.
 
 
 35
 Inasmuch as Continental was a neutral to whatever dispute the SIU or the Local had with Upper Lakes, and Continental merely did business with Upper Lakes, it is apparent that the work stoppage by members of the Local who were Continental employees, occurred on Continental premises. This was a secondary boycott. We cannot agree that the Local's activity was primary, rather than secondary. Any other conclusion would, in effect, nullify the secondary boycott provisions of the Act.[7]
 
 
 36
 Section 3692 covers matters formerly found in § 11 of the Norris-LaGuardia Act. It is inapplicable to a proceeding under the Labor Management Relations Act. This inapplicability is evidenced by § 10(h) (29 U.S.C.A. § 160 (h)) of said Act, which excludes such proceedings as injunction and enforcement from the limitations of the Norris-LaGuardia Act. Bakery Sales Drivers Local Union No. 33 v. Wagshal, 333 U.S. 437, 442, 68 S.Ct. 630, 92 L.Ed. 792 (1948); Building and Construction Trade Coun. of Met. Dist. v. Alpert, 1 Cir., 302 F.2d 594, 596-597 (1962).
 
 
 37
 In National Labor Relations Board v. Red Arrow Freight Lines, 5 Cir., 193 F. 2d 979 (1952), where a charge of contempt of a court of appeals was being considered it was held that respondents were not entitled to a jury trial.
 
 
 38
 Accordingly we hold that the district court properly denied respondents a trial by jury.
 
 
 39
 3. There is in this case implicit agreement by counsel that the law is: pending appeal, a district court may enforce its order for injunction or an order in a contempt proceeding based upon a violation of its order. Thus, counsel for respondents have not contended that their notices of appeal stayed the injunction orders or the contempt proceedings.
 
 
 40
 4. We hold that, in enforcing its orders, the district court may adapt the form of the application of its power according to the resistance to enforcement with which it is confronted. Inasmuch as the court pursued this course in the case at bar, we approve its actions. If its imposition of fines, based on each day a party fails to comply with an injunctional order, does not result in compliance, the court may increase such fines for subsequent days.
 
 
 41
 5. However, respondents urge upon us that the order of October 31, 1963 was invalid because the court had no power to amend the prior orders of August 14 and September 24, 1963, after notices of appeal had been filed from said orders. No such amendment occurred. When the August 14 order proved ineffective, the court further exercised its powers of coercion by entering the order of September 24, 1963. That was a new order which did not alter the amount of the fines levied by the August 14 order for the period prior to September 17, 1963. The September 24, order was more coercive, inasmuch as it carried a greater daily fine, but it was an order for a new period and not an amendment of an earlier order.
 
 
 42
 Again, the court's order of October 31, 1963 did not amend the two earlier orders. While it had suspended the accumulation of fines while no Upper Lakes vessel was in port, the court had then made it plain that, if the unlawful conduct should recur, it would reinstate and increase the fines. Thus the order of October 31, 1963, based on renewed violations, imposed new fines for a different period than the preceding orders and was designed to continue coercive pressure by the court to obtain compliance with its injunctional order.
 
 
 43
 Respondents in the case at bar fail to distinguish between a court's substantially and prejudicially amending its initial determination or judgment after an appeal has been perfected, and a situation, as here, where a court simply continues to seek, by lawful coercion, compliance by a recalcitrant litigant with an injunctional order of the court.
 
 
 44
 6. Respondents argue that the Board did not sustain its burden of proof by clear and convincing evidence that the Local had committed acts in violation of either of the injunction orders and hence the district court was without authority to hold the Local responsible. They rely upon § 6 of the Norris-LaGuardia Act (29 U.S.C.A. § 106) and its construction in United Brotherhood of Carpenters, etc. v. United States, 330 U.S. 395, 403, 67 S.Ct. 775, 91 L.Ed. 973 (1947). However, as we pointed out, ante 1020, in Bakery Sales Drivers Local Union No. 33 v. Wagshal, 333 U.S. 437, at 442, 68 S.Ct. 630, the Supreme Court recognized that, by § 10(h) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 160(h), Congress has removed the limitations of the Norris-LaGuardia Act upon the power of a court sitting in equity to issue injunctions against secondary boycotts when sought by the National Labor Relations Board. It will be noted that this is such a case. At a meeting of the members of the Local, the situation was discussed and a vote of the members was taken. Thus the Local was authorized by its members to and did engage in the boycott. It persisted therein despite the orders of the court. Inasmuch as we find that the petitioner has proved by clear and convincing evidence that the Local violated the injunction orders, we hold that the Norris-LaGuardia Act (especially § 6 thereof relied upon by respondents in support of their plea for reversal of the contempt orders), is not applicable.
 
 
 45
 7. Seeking refuge in the constitution of the United States, the Local argues that the fines imposed were excessive and violated the eighth amendment.[8] It says that the fines imposed upon it are completely out of proportion to its financial resources. It relies on United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947), where a majority of the court felt that an unconditional imposition of a fine of $3,500,000 against the defendant union was unwarranted as punishment for the criminal contempt theretofore committed. But the court, at 305, said that the judgment should be modified so as to require the defendant union to pay a fine of $700,000 and, further, to pay an additional fine of $2,800,000 unless within five days after issuance of the mandate it showed that it had fully complied with a temporary restraining order and a preliminary injunction issued in that case, and at 307, 67 S.Ct. at 703, the court said:
 
 
 46
 "* * * Punishment in this case is for that which the defendants had done prior to imposition of the judgment in the District Court, coupled with a coercive imposition upon the defendant union to compel obedience with the court's outstanding order." (Italics supplied.)
 
 
 47
 In the case at bar the accumulation of fines against the Local was the direct result of its refusal to obey the orders of the district court. The imposition of the fines was for the purpose of coercing the Local into obeying the court's orders. Obedience was called for and defiance was the response. The natural result of the Local's recalcitrance was more coercive orders from the court. If this brought financial discomfort to the Local, it had only itself and those who advised it to blame, because the court, in seeking obedience to its orders, was required to exert more pressure.[9] It must have been apparent to the Local, if it were well-advised, that it could not defy the valid orders of a United States court. The fining and subsequent accumulation of successive fines came, not as a punishment of the Local, but as a consequence of the impact of its defiance of the orders. The series of orders fixing the amounts of fines was geared to and measured by the response of the Local to the court's orders. It has no right to complain of the results which followed its persistent violations, any more than an overweight individual has just cause for complaint against the scale upon which he stands which informs him of his overweight. While the fines were accumulating it might have been well for the Local to have consulted with its advisors as to the effect upon its alleged "net worth of * * * about $16,000.00" and its alleged monthly income of "around $1300", of which it now informs us.
 
 
 48
 We cannot say that the fines imposed were excessive.
 
 
 49
 8. Respondents' brief contends that the order of September 24, 1963 was invalid because the court denied due process to the Local when, it says, the court "imposed a new penalty for alleged contempt even though no petition or motion for contempt was pending".
 
 
 50
 Our examination of the proceedings in the district court reveals substantially the following:
 
 
 51
 On September 17, 1963, respondents' counsel presented the Local's motion to remit fine and show of record that the mandatory injunction entered on June 14, 1963 had been satisfied.
 
 
 52
 In the course of the proceedings, petitioner's counsel, in resisting the motion to remit, stated, in part:
 
 
 53
 "They have defied this Court the entire summer, they have defied the Labor Relations Board and the laws of the United States Government since early in April and they are continuing to do this, your Honor. If this is held to be compliance then this entire proceeding has been a nullity.
 
 
 54
 "* * * I have witnesses to show there have been four separate attempts to load these ships since the contempt order and the men themselves still stand en masse and will not load the ships. They have not done anything except what they have previously done all summer." (Italics supplied.)
 
 
 55
 The court pointed out that, as he considered the Local had made a prima facie case of compliance, it became necessary (for the Board) to show that in fact this was not compliance and that in fact "they have not discontinued a secondary boycott but are actually and in fact continuing a secondary boycott". (Italics supplied.) The court referred to the answer of the Board, saying
 
 
 56
 "I do say that the issue is joined as to whether or not there has been compliance with the mandatory injunction. The issue is joined and I am ready to proceed with the hearing." (Italics supplied.)
 
 
 57
 It is interesting to note that, while the court indicated its intention of proceeding to hear evidence pertaining not only to the motion to remit but also to compliance with the injunction up to the very time of the hearing, and actually did hear evidence within that time scope, Local's counsel, who participated in such hearing, made no suggestion that there had been no notice filed or order to show cause issued, such as they now say was required by rule 18 of the local rules of civil procedure of the district court. Therefore they waived any right to insist upon such a step or steps being taken. At the conclusion of the hearing the court directed the drafting of an order, with the statement that he would increase the fine forthwith from $200 to $500 a day.[10]
 
 
 58
 The requirements of due process of law were met in the proceeding of September 17, 1963 which culminated in the entry of the foregoing order. The Local was represented that day in open court by able counsel, who had represented it throughout the entire prior proceeding in the district court and since in this court. It was advised of the charges against it by the above-detailed proceeding in open court. It therefore had a reasonable opportunity to meet those charges by way of defense or explanation and, through its several attorneys, actually made a substantial defense and what they considered an explanation. The Local's counsel, three in number, had the right to call witnesses, if they saw fit. They called none. Actually they expressed no intention of calling witnesses. Cf. Cooke v. United States, 267 U.S. 517, 536, 45 S.Ct. 390, 69 L.Ed. 767 (1925), cited by the Local in its brief here.
 
 
 59
 The proceeding on September 17, 1963, resulting in the September 24 order, was conducted in accordance with constitutional principles.
 
 
 60
 9. We now turn to respondents' contention (which is probably frivolous), that there can be no contempt of the order of June 14, 1963 because that order became a nullity by reason of the district court's substantive amendment thereof, sua sponte, on August 6, 1963 when it deleted paragraph 2[11] thereof nunc pro tunc as of June 14, 1963. They maintain there was no compliance with 28 U.S.C.A., rule 65, providing that an order or injunction must be complete in itself and not dependent on any other document. This deletion in no way affected the remainder of the injunction order, because respondents agreed to, if they did not induce, the deletion of paragraph 2.[12] They are in no position to complain.
 
 
 61
 For these reasons, we affirm the orders from which these four appeals were taken.
 
 
 62
 Orders affirmed.
 
 
 
 Notes:
 
 
 [1]
 Included were two men on vacation and some men doing carpenter and other work
 
 
 [2]
 The Local on June 27, 1963 filed a notice of appeal from the order of June 4, 1963
 
 
 [3]
 The Local and SIU by the same notice appealed from the order of June 14, 1963
 
 
 [4]
 On August 14, 1963 the court dismissed the contempt proceeding as to SIU
 
 
 [5]
 It is not necessary that all of these findings be in the form of written statements. American Glass Co. v. Michigan Mutual Liability Co., 7 Cir., 327 F.2d 776, 778, Fn. 2 (1964)
 
 
 [6]
 "I find from the evidence presented at this hearing that on or about October 4th of 1963 the SS Erickson, being a ship of the Upper Lakes Shipping Company, Limited, docked at the Port of Chicago alongside of Elevator B of Continental Grain Company and was prepared for the loading of grain;
 "That the employees, members of Local 418, the respondent union, of Continental were ordered by Continental Grain Company through its supervisor, Gunther Goldschmidt, to load the ship;
 "That the employees, members of the respondent, unanimously and in concert refused to load the ship.
 "I find that the conduct is evidence of a continuation of a secondary boycott which was ordered by this Court to be discontinued in its injunctive order signed by this Court on June 14, 1963.
 "I find that thereafter, on October 6th of 1963, a ship of Upper Lakes Shipping Company docked alongside Elevator A of Continental Grain Company at the Port of Chicago and that the superintendent called all employees, approximately 24 of them appeared, and ordered them to load the vessel;
 "That all 24 unanimously and in concert indicated simultaneously with raised hands that they refused to load the ship.
 "I find further that this conduct of refusal is evidence of a continuation of a secondary boycott which was enjoined by the order of this Court on June 14, 1963.
 "I find that further on October 11, 1963 the Erickson, a ship of the Upper Lakes Shipping Company, Limited, docked alongside Elevator B at the Port of Chicago.
 "Continental Grain Company again ordered its employees to load and they unanimously and in concert refused to load and that this conduct constituted evidence, clear and convincing evidence, to this Court of a continuation of the secondary boycott which this Court ordered discontinued on June 14, 1963.
 "I find that again on October 26th, 1963 the Erickson, or the SS Erickson, a ship of Upper Lakes Shipping Limited, again docked, prepared to load, that Continental Grain Company ordered its employees to load the ship and that there were 22 who refused to load and none who agreed to load, and that this was continuing, concerted action, a continuation of the secondary boycott which was enjoined by this Court on June 14, 1963.
 "I find the conduct of the respondent union in each of those four instances deliberate and contemptuous of the orders of this Court, for which they shall be fined for each of said instances the amount of $3,000."
 
 
 [7]
 Respondents' brief states that Continental was a party of this suit. This statement is in error. It merely filed charges with the National Labor Relations Board
 
 
 [8]
 Amendment VIII. "Excessive bail shall not be required, nor excessive fines imposed, * * *."
 
 
 [9]
 If fines were ineffectual, jail sentences of individuals responsible for the Local's stubborn noncompliance would have also been within the court's power
 
 
 [10]
 Because of the anticipated absence from court of some of the counsel, the presentation and entry of the order were delayed until September 24, 1963
 
 
 [11]
 Said paragraph prohibited "all members" of the Local from refusing in concert to perform services for Continental if an object thereof was to force it to stop doing business with Upper Lakes
 
 
 [12]
 On August 6, 1963, respondents' attorneys filed a withdrawal of their "Notice of Appeal which was filed on June 27, 1963, it appearing in open court that upon such withdrawal the District Court will enter an order amending its injunction order of June 14, 1963, by striking out Paragraph 2, Page 4 thereof."