**ALLIED INTERNATIONAL, INC.,**
Plaintiff, Appellant,

v.

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO et al.,**
Defendants, Appellees.

No. 80–1425.

United States Court of Appeals,
First Circuit.

Argued Oct. 8, 1980.

Decided Jan. 6, 1981.

Before ALDRICH, CAMPBELL and BOWNES, Circuit Judges.

CAMPBELL, Circuit Judge.

This is an appeal from a decision of the district court, 492 F.Supp. 334, denying plaintiff-appellant's motion for a preliminary injunction and granting defendants-appellees' motion to dismiss.[1]

The facts are much like those recently before this court in *Walsh v. ILA, Local 799*, 630 F.2d 864 (1st Cir. 1980). Allied International, Inc., is an importer of Russian wood products, which has contracted with two agencies of the USSR for the purchase of birch hardwood and plywood. Allied has also contracted (through a third Soviet agency) with Waterman Steamship Co. for the shipment of these wood products to the United States from the USSR. Waterman employs John T. Clark & Son, a stevedoring company, to unload its ships docking in Boston. Clark's initial source of longshoremen is a hiring hall, operated by defendants International Longshoremen's Association (ILA) and its Local 799 pursuant to a collective bargaining agreement between the unions and the Boston Shipping Association.

On January 9, 1980, one of Waterman's ships, the *Walton*, was in Boston unloading a portion of Allied's plywood and hardwood, prior to further unloading at other ports along the East Coast. On that date, defendant Thomas Gleason, President of the ILA, ordered ILA members to cease handling cargoes bound for or arriving from the Soviet Union, in protest of the invasion of Afghanistan by Soviet armed forces.[2] In

Duane R. Batista, Boston, Mass., with whom Danielle DeBenedictis, and Nutter, McClennen & Fish, Boston, Mass., were on brief, for plaintiff, appellant.

Ernest L. Mathews, Jr., New York City, with whom Charles R. Goldburg, New York City, Condon & Doyle, Boston, Mass., and Thomas W. Gleason, New York City, were on brief, for defendants, appellees.

1. Defendants moved to dismiss plaintiff's complaint for failure to state a claim on which relief could be granted. Since, in adjudicating this motion, the district court considered various affidavits submitted by the parties, we will treat the motion as if it were a motion for summary judgment. Fed.R.Civ.P. 12(b).

2. The directive stated:
   "In response to overwhelming demands by the rank and file members of the Union, the leadership of ILA today ordered immediate suspension in handling all Russian ships and all Russian cargoes in ports from Maine to Texas and Puerto Rico where ILA workers are employed.
   "This order is effective across the board on all vessels and all cargoes. Grain and other foods as well as high valued general freight. However, any Russian ship now in process of loading or discharging at a waterfront will be worked until completion.
   "The reason for this action should be apparent in light of international events that have

response to Allied's inquiries, Gleason informed Allied that ILA members would unload the *Walton's* cargo in Boston, but not at any other United States port. As a result, Waterman cancelled the *Walton's* scheduled calls, and unloaded all of Allied's wood products cargo in Boston, where it was stored, accruing demurrage and security charges. Waterman also restricted the cargo then being loaded into the *Middleton* in Leningrad to one-third its scheduled size, cancelled its delivery to scheduled United States ports, and unloaded the wood products in Montreal. In addition, Waterman repudiated its agreement to transport Allied's wood products aboard the *Jefferson*, which had not yet been loaded. ILA and Local 799 representatives informed Allied on March 12 and March 25, 1980 that no ILA members would unload any cargo originating in the USSR.

On March 31, 1980, Allied filed a complaint in the district court alleging that the ILA's actions violated (1) the National Labor Relations Act (NLRA) prohibition against secondary boycotts, section 8(b)(4), 29 U.S.C. § 158(b)(4), for which Allied has a private right of action under section 303 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 187, and (2) the Sherman Act, 15 U.S.C. § 1, and (3) constituted tortious interference with Allied's business relationships, in violation of admiralty law. The action was consolidated with *Walsh v. ILA, supra,* in which the Regional Director of the NLRB sought a preliminary injunction against the ILA Russian boycott. In a memorandum of June 17, 1980, the district court concluded that Allied had failed to state a cause of action on any of its three legal theories, and consequently dismissed the complaint. We examine each of appellant's claims seriatim.

affected relations between the U. S. & Soviet Union.
"However, the decision by the Union leadership was made necessary by the demands of the workers.
"It is their will to refuse to work Russian vessels and Russian cargoes under present conditions of the world.

## Secondary Boycott

The district court relied on its decision in *Walsh v. ILA*, 488 F.Supp. 524 (D.Mass. 1980), in holding that Allied had not alleged a violation of NLRA section 8(b)(4), 29 U.S.C. § 158(b)(4), the secondary boycott prohibition. We did not reach the merits of the secondary boycott question on appeal in *Walsh*, because we considered the issue foreclosed in that case by the decision in *Baldovin v. ILA*, Civ.No. 80–259 (S.D.Tex. Feb. 15, 1980). *Baldovin* involved the ILA's refusal to load grain aboard a ship bound for the Soviet Union, and the district court held the NLRB lacked jurisdiction over the dispute because it was not "in commerce." Subsequent to our decision in *Walsh*, the Court of Appeals for the Fifth Circuit affirmed that holding. *Baldovin v. ILA*, 626 F.2d 445 (5th Cir. 1980). Because this case concerns parties different from those in *Baldovin*, that decision has no preclusive effect here. We therefore confront the secondary boycott issue on the merits.

Section 8(b)(4) provides, in pertinent part:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\*  \*  \*  \*  \*  \*

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\*  \*  \*  \*  \*  \*

"People are upset and they refuse to continue the business as usual policy as long as the Russians insist on being international bully boys. It is a decision in which the Union leadership concurs."

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person ... *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing...."

We proceed first to the same question decided negatively by the Fifth Circuit in *Baldovin*—whether the secondary activity in question is sufficiently related to commerce to come within the prohibitions of the NLRA. *See* NLRA §§ 2(6) & (7), 29 U.S.C. §§ 152(6) & (7). While this case does not, as did *Baldovin* and *Walsh*, require consideration of the jurisdiction of the National Labor Relations Board, *see* NLRA § 10(a), 29 U.S.C. § 160(a), the secondary boycott prohibition itself reaches only activities aimed at individuals "employed by any person engaged in commerce or in any industry affecting commerce."

At first blush, it might appear too plain for discussion that the ILA's refusal to unload Allied's goods affects both commerce and a person engaged in commerce. Allied, Waterman and Clark are American companies and the ILA is an American union. All engage regularly in business affecting the transportation of goods among the several states. Indeed, the instant dispute arose when the ILA's actions allegedly impeded Allied's ability to move its wood products from Boston to other ports along the East Coast, and Allied contends that the ILA continues to frustrate its ability to transport its goods into this country.

However, the terms "in commerce" and "affecting commerce," as used in the NLRA, are "obviously not self-defining," *Windward Shipping (London) Ltd. v. American Radio Association,* 415 U.S. 104, 112, 94 S.Ct. 959, 964, 39 L.Ed.2d 195 (1974). They must be considered in light of the gloss placed upon them in a series of Supreme Court cases dealing with the scope of jurisdiction under the Act.

In *Benz v. Compania Naviera Hidalgo,* 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957), the Court held that the protections of the Act did not extend to picketing by American unions in support of a strike staged by foreign seamen against their foreign shipowner-employers. Since Congress did not intend the Act to cover "wage disputes arising on foreign vessels between nationals of other countries," *id.,* at 142, 77 S.Ct. at 702, the Act did not preempt a state law damage action brought by the shipowners against the unions.

While *Benz* relied solely on the legislative history of the NLRA, *Incres Steamship Co. v. International Maritime Workers Union,* 372 U.S. 24, 83 S.Ct. 611, 9 L.Ed.2d 557 (1963), joined the *Benz* rationale to the Act's "affecting commerce" terminology. *Incres,* like *Benz,* considered whether the NLRA deprived a state court of jurisdiction over picketing of foreign-flag ships by American unions in support of a labor dispute between shipowners and a foreign crew. Concluding that "maritime operations of foreign-flag ships employing alien seamen are not 'in commerce' within the meaning of [NLRA] § 2(6)," *id.,* at 27, 83 S.Ct. at 613, the Court held that the Act did not protect the picketing from operation of state law. In *McCulloch v. Sociedad Nacional de Marineros,* 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), a companion case to *Incres,* the Court held that the NLRB had no jurisdiction to order a "representation election" among the foreign crews of foreign-flag vessels.

In contrast, the Court in *ILA, Local 1416 v. Ariadne Shipping Co.,* 397 U.S. 195, 90 S.Ct. 872, 25 L.Ed.2d 218 (1970), held that picketing directed at foreign-flag ships in order to protest substandard wages paid to non-union American longshoremen *was* arguably protected by section 7 of the Act, and thus not subject to the jurisdiction of the Florida courts. As the Court later described the case, in *Windward Shipping (London) Ltd. v. American Radio Association, supra,* 415 U.S. at 114, 94 S.Ct. at 965, *Ariadne* differed from *Benz* and *Incres* in that the protest "could be accommodated by a wage decision on the part of the shipown-

ers which would affect only wages paid within this country." In *Windward Shipping* itself, however, the Court again held that picketing foreign ships to protest wages paid to foreign seamen was not activity "affecting commerce," even though the picketing was staged by American unions not in support of the foreign crew but to publicize the competitive advantage enjoyed by the foreign ships vis-a-vis American shippers which employed American union members. According to the *Windward* Court, the line of cases beginning with *Benz* sought to delineate "the threshold of interference with the maritime operations of foreign vessels which makes the [Act] inapplicable." *Id.*, at 114, 94 S.Ct. at 965. Because the pickets in *Windward* "[a]t the very least ... must have hoped to exert sufficient pressure so that foreign vessels would be forced to raise their operating costs to levels comparable to American shippers," thus occasioning "more than a negligible impact on the 'maritime operations' of these foreign ships," *id.*, the dispute was at root an attempt to interfere with the internal workings of a foreign vessel, the sort of controversy to which the Act had already been held not to apply in *Benz* and *Incres.*

Were this the extent of the precedent before us, we would have little hesitation finding the instant dispute within the coverage of the NLRA. We note that all of the above cases involved the question whether the Act affirmatively protected union activity directed at the working conditions aboard foreign-flag vessels (with the exception of *Ariadne*, in which the Act was found to apply). None considered the scope of the secondary boycott provisions, or whether secondary activity by an American

union against an American employer was outside the purview of those provisions simply because "motivated" by a "primary dispute" between the union and a foreign entity. To find that the picketing in *Incres, Benz* and *Windward* was protected by the Act would have implied the jurisdiction of the NLRB over the foreign labor conditions that gave rise to the picketing. This, in turn, "would necessitate inquiry into the 'internal discipline and order' of a foreign vessel, an intervention thought likely to 'raise considerable disturbance not only in the field of maritime law but in our international relations as well.'" *ILA, Local 1416 v. Ariadne Shipping Co., supra*, 397 U.S. at 198, 90 S.Ct. at 873–874 (*quoting McCulloch v. Sociedad Nacional de Marineros, supra*, 372 U.S. at 19, 83 S.Ct. at 676). In *McCulloch*, the Court confronted an *actual* attempt by the Board to interfere in what was essentially a foreign labor dispute.

In such cases there exist considerations of "comity and accommodation in international trade," *Windward, supra*, 415 U.S. at 113, 94 S.Ct. at 964, clearly not present in the instant action. Here, an American union has ordered its members not to work for an American stevedore which had contracted to service an American ship carrying goods of an American importer, insofar as the work would involve handling goods originating in the Soviet Union. There is no question of interference in the affairs of a foreign employer. Moreover, while the work stoppage was motivated by what might be termed a "primary dispute" between the ILA and the USSR over the latter's military policy,[3] it would be absurd

---

**3.** The elusiveness of any attempt to fit aspects of this rather unique case comfortably within the traditional categories of labor law is illustrated by the fact that the "primary dispute" could just as easily, and perhaps more appropriately, be characterized as one between Afghanistan and Russia (or assuming the viewpoint of the ILA, between the Soviet Union and American governments). There is no dispute between the ILA and Russia over matters traditionally thought to be the subject of union concern.

In *Madden v. Grain Elevator Workers Local 418*, 334 F.2d 1014 (7th Cir. 1964), *cert. denied*, 379 U.S. 967, 85 S.Ct. 661, 13 L.Ed.2d 560 (1965) (discussed *infra*), an American union directed employees of an American grain wholesaler not to load grain onto ships owned by a Canadian employer engaged in a dispute with a Canadian union. There was no suggestion of a primary dispute—or any dispute—between the American union and the Canadian shipper, regardless of the fact that the American union may have disapproved of the way in which the Canadian employer was treating Ca-

to contend that application of the secondary boycott provisions would imply NLRB jurisdiction over *this* primary dispute, *i. e.,* over Soviet military policy. By the same token, the inability of the NLRB to adjudicate the propriety of the Soviet Union's incursion into Afghanistan need not, at least as a matter of logic, inexorably preclude a finding that the "secondary dispute" on which this lawsuit is based satisfies the jurisdictional requirements of section 8(b)(4). What is at stake is simply whether an American firm is entitled to be shielded by the Act from illegal actions in this country directly affecting its domestic business.

Our consideration of the issue is complicated, however, by the Supreme Court's decision in *American Radio Association v. Mobile Steamship Association,* 419 U.S. 215, 95 S.Ct. 409, 42 L.Ed.2d 399 (1974). *Mobile* involved facts similar to those in *Windward.* Six maritime unions engaged in picketing designed to publicize the adverse impact on American seamen of the low wages paid foreign crews working on foreign-flag carriers. In *Windward,* it was the shipowners who had sued the unions, and the Court rejected the unions' claim that the picketing was protected by section 7 of the Act. In *Mobile,* the plaintiffs were American stevedoring companies which sought to service the ships, and the unions defended on the ground that, since the picketing was arguably *prohibited* by section 8(b)(4), state court jurisdiction was preempted. Faced with this attempt to distinguish the controversy between the unions and the ships from that between the unions and the stevedores, the Court rejected the argument "that the line of cases commencing with *Benz* and culminating in *Windward* permit such a bifurcated view of the effects of a single group of pickets at a single site." *Id.,* at 222, 95 S.Ct. at 414.

There is language in *Mobile* that can be read as indicating that the reach of the secondary boycott prohibition depends sole-

ly on the nature of the underlying "primary dispute" giving rise to the secondary activity. The rejection of a "bifurcated view" of a union's actions might seem to imply that characterization of the primary dispute as not "in commerce" controls the jurisdictional issue. *See Baldovin v. ILA, supra,* 626 F.2d at 452–53. *See also Walsh v. ILA, supra,* 630 F.2d at 874–75 & n.13. Indeed, the *Mobile* majority apparently rejected, in the course of discussing precedent relied upon by the four dissenters, "the proposition that a secondary employer's domestic business activities may be the basis for Board jurisdiction where the primary dispute is beyond its *statutory* authority over unfair labor practices 'affecting commerce.'" *Id.,* 419 U.S. at 226, 95 S.Ct. at 416.

On the other hand, the Court also said that *Mobile* "need cast no doubt on those cases which hold that the Board has jurisdiction under § 8(b)(4) of domestic secondary activities which are in commerce, even though the primary employer is located outside the United States. *See Madden v. Grain Elevator Workers Local 418,* 334 F.2d 1014 (CA7 1964), *cert. denied,* 379 U.S. 967, 85 S.Ct. 661, 13 L.Ed.2d 560 (1965); *Grain Elevator Workers Local 418 v. NLRB,* 126 U.S.App.D.C. 219, 376 F.2d 774, *cert. denied,* 389 U.S. 932, 88 S.Ct. 296, 19 L.Ed.2d 285 (1967)." 419 U.S. at 225 n.10, 95 S.Ct. at 415 n.10. *Madden* and *Grain Elevator Workers* both involved the same dispute. A Canadian union was engaged in a labor dispute with a Canadian shipper-employer. In support of the Canadian union, Grain Elevator Workers, an American union representing employees of the American secondary employer, induced its member-employees to cease loading the American employer's grain onto the Canadian ships. Both courts soundly rejected the contention that the NLRB lacked jurisdiction over the secondary boycott. As the court said in *Madden*:

nadian union members. In conventional labor law analysis, the court found the primary dispute to be between the Canadian employer and the Canadian union, and the secondary dispute to be between the American union and the

American employer. If the analogy is followed here, the primary dispute is between the USSR and Afghanistan, and the secondary dispute between the ILA and persons carrying Russian-made goods.

"No attempt is being made to regulate or to apply the Act to the 'internal management or affairs' of the Upper Lakes Ships .... No conflict between American and Canadian policies can result from halting an illegal secondary boycott in this country, directed against an American employer by an American labor organization and involving employees working in a domestic plant of the American employer."

334 F.2d at 1019.

We think, likewise, that application of section 8(b)(4) here would portend no interference in the management or affairs of foreign companies, workers, or labor organizations. This case is thus far removed from the situation that faced the Court in *Mobile*. There, the Court was concerned, as it had been in *Windward*, with an attempt by picketing unions to influence the "internal maritime operations of foreign ships." The Court noted that

"the response of the employees of the American stevedores was a crucial part of the mechanism by which the maritime operations of the foreign ships were to be affected.... The effect of the picketing on the operations of the stevedores and shippers, and thence on these maritime operations, is precisely the same whether it be complained of by the foreign-ship owners or by persons seeking to service and deal with the ships."

419 U.S. at 224–25, 95 S.Ct. at 415. We read *Mobile* as establishing that in the case of interrelated labor disputes, particularly disputes that give rise to similar conduct carried out at a single site, a "primary dispute" cannot be extricated from a "secondary dispute" for purposes of contrary jurisdictional findings.

■ Here, however, there is no attempt to "bifurcate" the effects of a single union action. The *only* labor-related activity in issue has been played out by an all-American cast. The fact that this domestic labor dispute was inspired by military events in foreign lands—events far beyond NLRB jurisdiction—does not counsel against application of the NLRA to the labor dispute ongoing here at home. In sum, none of the considerations that prompted the Court in cases such as *Windward, Incres,* and *Benz* to find the Act inapplicable have force in this context. We hold, therefore, that section 8(b)(4) applies, and we must thus determine whether the ILA's activities are proscribed by that section.[4]

In *Local 1976, United Brotherhood of Carpenters v. NLRB*, 357 U.S. 93, 98, 78 S.Ct. 1011, 1015, 2 L.Ed.2d 1186 (1958), the Supreme Court formulated a three-part test to identify a violation of section 8(b)(4):

"Employees must be induced; they must be induced to engage in a strike or concerted refusal; an object must be to force or require their employer or another person to cease doing business with a third person."

There can be little doubt that the first two parts of this test are met here: it is uncontroverted that the ILA leadership directed ILA members, including members of Local 799, employees of Clark, to engage in a concerted refusal to handle a certain class of goods which Clark had contracted to service. The ILA argues, however, that it lacked an "object" to bring about the entirely foreseeable result of its action—the forced cessation of business between Clark and Waterman, and Waterman and Allied,

---

**4.** Contrary to the suggestion in Judge Aldrich's separate opinion, this conclusion is not dependent on the "result reached." We quite agree that "either an act of Congress covers a particular dispute or it does not"; in our view, however, section 8(b)(4) "covers" this dispute, and we believe that the scope of the *Benz-Mobile* line of cases is narrower than the dissent/concurrence would have it. We understand our brother to construe the *Benz-Mobile* line as reflecting a fundamental principle that Board jurisdiction exists only where the Board has jurisdiction over the primary dispute. But we think those cases are adequately explained on the principle that in a case involving *intertwined* "primary" and "secondary" *labor* disputes, lack of Board jurisdiction over the primary dispute will preclude Board jurisdiction over the secondary conduct—more particularly where a contrary ruling might well suggest an improper interference by the United States in the relationship between foreign employers and laborers. We see no need to extend *Benz-Mobile* beyond this.

in relation to Russian goods being transported into this country.

According to the ILA, its "sole object is to vindicate the consciences of its members who find it repugnant to do business as usual with the aggressor and, by passive action, to protest politically the invasion of Afghanistan."[5] However, the ILA has chosen to carry out its goal of protest through action—a selective work stoppage—which by its very nature is designed to force at least partial cessation of business between companies with which ILA has no labor-related grievance. While the ILA boycott may be a heartfelt act of protest against conduct that the ILA leadership and many ILA members find "repugnant," we cannot accept the proposition that this negates a finding that the "objective" of the boycott is one proscribed by section 8(b)(4). Nor do we think that this section was meant to permit any and all union actions designed to keep union members from "doing unconscionable work" or to protect their "moral integrity, spiritual welfare, and political convictions."

■ It is well established that a union engages in prohibited secondary activity when it induces employees of a neutral employer to refuse to handle or work on goods originating from or bound for a particular person with whom the union, or another labor group, is having a dispute. *NLRB v. Local No. 3, International Brotherhood of Electrical Workers*, 477 F.2d 260 (2d Cir.) (refusal to install material delivered by nonunion employees), *cert. denied*, 414 U.S. 1065, 94 S.Ct. 572, 38 L.Ed.2d 470 (1973); *Grain Elevator Workers Local 418 v. NLRB*, 376 F.2d 774 (D.C.Cir.) (refusal to load grain on ships owned by Canadian employer embroiled in foreign labor dispute), *cert. denied*, 389 U.S. 932, 88 S.Ct. 296, 19 L.Ed.2d 285 (1967); *Madden v. Grain Elevator Workers Local 418*, 334 F.2d 1014 (7th Cir. 1964) (same), *cert. denied*, 379 U.S. 967, 85

S.Ct. 661, 13 L.Ed.2d 560 (1965); *NLRB v. Local 810, Steel, Fabricators & Warehousemen*, 299 F.2d 636 (2d Cir. 1962) (refusal to work for secondary employer in connection with contract with primary employer against which union conducting strike); *NLRB v. Brewery & Beer Distributor Drivers, Local 830*, 281 F.2d 319 (3d Cir. 1960) (refusal to load beer orders bound for companies which had not signed union agreement); *NLRB v. Wine Workers Union Local 1*, 178 F.2d 584 (2d Cir. 1949) (refusal by employees of distributors to handle product of company engaged in strike with sister union). Of any of these cases it could be said that the defendant unions and their members would have found it "repugnant" to facilitate the business of companies they thought were, for example, mistreating brother laborers or paying substandard wages. *Cf. NLRB v. Local No. 3, International Brotherhood of Electrical Workers, supra*, 477 F.2d at 263 (concerted refusal to handle said to result initially from "individual acts of conscience"). Yet when a union orders all employees of a neutral employer to cease handling goods originating from a particular source, it is *a fortiori* forcing that employer to "cease doing business with" that source. In such a case, it is difficult to say that the cessation of business is not at least *an* object of the union order, in the absence of facts that might indicate the contrary; and it is not necessary that the cessation of business be the *sole* object in order to be an object prohibited under section 8(b)(4), *NLRB v. Denver Building & Construction Trades Council*, 341 U.S. 675, 689–90, 71 S.Ct. 943, 952, 95 L.Ed. 1284 (1951).

■ We think that the object of a boycott, for purposes of section 8(b)(4)(ii)(B), can be inferred from the virtually inevitable results generated by it, at least when, as here, the union's conduct can under no reading of the facts be characterized as "pri-

---

5. Accepting that the boycott sought to protest Soviet aggression, we may still note that this goal of protest was certainly furthered by causing Clark and Waterman to cease handling Allied's Russian-made goods—and was additionally enhanced by Allied's resulting cutback in its trade with the Soviet Union.

mary activity" protected by the Act.[6] *See NLRB v. Retail Store Employees Union, Local 1001,* 447 U.S. 607, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980); *NLRB v. Local 825, International Union of Operating Engineers,* 400 U.S. 297, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971); *NLRB v. Twin City Carpenters District Council,* 422 F.2d 309, 314 (8th Cir. 1970). The Supreme Court recently held, in *NLRB v. Retail Store Employees Union, supra,* that section 8(b)(4) forbids secondary picketing against a "struck product" when such picketing "*predictably* encourages consumers to boycott a neutral party's business," 100 S.Ct. at 2374 (emphasis added). In determining whether the union's "object" was one proscribed by section 8(b)(4), the Court not only held that the union was "responsible for the foreseeable conse-

quences of its conduct," *id.,* 100 S.Ct. at 2377 n.9, it did so in a context in which the union's activity—picketing a struck product—differed only in degree from conduct that had already been held to be protected primary activity in *NLRB v. Fruit & Vegetable Packers, Local 760,* 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964). Holding the picketing in *Retail Store Employees* to constitute a forbidden secondary boycott, the Court focused almost exclusively on the nature of the foreseeable injury to neutral parties: "Product picketing that *reasonably can be expected* to threaten neutral parties with ruin or substantial loss simply does not square with the language or the purpose of § 8(b)(4)(ii)(B)." 100 S.Ct. at 2377 (emphasis added).

**6.** The conclusion might be somewhat different in a situation where identical union conduct could be found to be either protected primary activity or unlawful secondary activity depending on the union's objective. For example, in *National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), the Court considered whether a union's refusal to handle prefabricated goods was a protected effort to preserve the jobs of union members or activity calculated to satisfy the union's objectives elsewhere. The Court held that once it was found, by reference to circumstances such as "the threat of displacement by the banned product or services, the history of labor relations between the union and the employers who would be boycotted, and the economic personality of the industry," *id.,* at 644 n.38, 87 S.Ct. at 1268 n.38, that the union action *did* serve the legitimate purpose of work preservation, the conduct could not be held unlawful simply because it had the ancillary effect of diminishing business between the employer and the source of the prefabricated materials. *Cf. NLRB v. Enterprise Ass'n & General Pipefitters, Local 638,* 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977) (objective of work preservation *will not* protect pressure leveled against employer with no power to assign work sought).

The Court recently faced a similar situation in *NLRB v. ILA,* 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980), which involved the ILA's "Rules on Containers," characterized by the Board as a "hot cargo" provision and by the union as a "work preservation agreement." The Court remanded the case to the Board for further consideration, holding that the dispositive issue was whether the agreement had the effect of preserving work of the sort performed

by ILA members prior to the era of containerization, and not whether the agreement would displace work performed by truckers and consolidators after the introduction of containerized shipping. In the course of criticizing the Board's treatment of the case, the Court noted that, should the agreement be found to preserve work for union members, it would not matter that it also generated secondary effects:

> "The effect of work preservation agreements on the employment opportunities of employees not represented by the union, no matter how severe, is of course irrelevant to the validity of the agreement so long as the union had no forbidden secondary purpose to affect the employment relations of the neutral employer."

*Id.,* 100 S.Ct. at 2315 n.22. In the context in which this statement was made, it reflects nothing more than a reiteration of the accepted proposition that a union is entitled to engage in primary activity no matter how severe the incidental effects on neutral parties. *National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. 612, 627, 87 S.Ct. 1250, 1259, 18 L.Ed.2d 357 (1967). It should be noted, moreover, that the Court directed the Board to determine whether the agreement had "as its objective" the preservation of work traditionally performed by union members by focusing on the "nature of the work both before and after [containerization]"—*i. e.,* an examination of external facts and circumstances. It was nowhere suggested that the union leadership's subjective "intent" to preserve jobs would save such an agreement that did not, in fact, have the *effect* of preserving work. The ILA boycott at issue here does not have the effect of realizing *any* protected union goal.

It has long been recognized that section 8(b)(4) was enacted for the purpose of "shielding unoffending employers and others from pressures in controversies not their own." *National Woodwork Manufacturers Association v. NLRB*, 386 U.S. 612, 627, 87 S.Ct. 1250, 1259, 18 L.Ed.2d 357 (1951). Balanced against this congressional objective is the "right of labor organizations to bring pressure to bear on offending employers in primary labor disputes." *Id.* This competing concern is reflected in the proviso of section 8(b)(4)(ii)(B)—which exempts from the section "any primary strike or primary picketing"—and in the affirmative protection accorded primary union activity under the NLRA. Thus, unions are protected when engaging in primary activity no matter how severe the impact on neutral employers, *id.*, at 627, 87 S.Ct. at 1259, but are forbidden from pressuring an employer when the pressure is "calculated to satisfy union objectives elsewhere." *Id.*, at 644, 87 S.Ct. at 1268. *See also NLRB v. Enterprise Association & General Pipefitters*, 429 U.S. 507, 528, 97 S.Ct. 891, 903, 51 L.Ed.2d 1 (1977).

In this case neither of these "dual congressional objectives" would be furthered by finding the ILA boycott beyond the scope of section 8(b)(4). We think it plain that the ILA was not engaged in primary activity and that the boycott against Allied's goods was "calculated to satisfy union objectives elsewhere." The ILA concedes it has no dispute with Clark, Waterman, or Allied, and there is no suggestion that it seeks to affect the labor relations of any of these employers. It is also plain that these "unoffending employers" have been embroiled in a "controversy not their own" as a result of union action which "reasonably could be expected" to "threaten a neutral party with ruin or substantial loss," *cf. NLRB v. Retail Store Employees Union, supra*, 100 S.Ct. at 2377.[7]

The district court in *Walsh v. ILA, supra,* nevertheless held that the ILA boycott did not violate section 8(b)(4) because the "primary dispute" was not a "labor dispute." 488 F.Supp. at 530. In so holding, the court relied in large part on the following language from *Mishara Construction Co. v. International Brotherhood of Electrical Workers*, 554 F.2d 488, 491 (1st Cir. 1977): "the statutory prohibition only applies when employees of a secondary employer are induced to strike or ... to use other economic pressures against their employer to aid a union that has a dispute with another employer." The district court interpreted this passage to require a dispute with a "primary employer" before a violation of section 8(b)(4) could be found. As the district court noted, however, this statement was made in the course of dealing with an entirely different issue—whether the union had used the sort of "coercive" measures a violation of the section requires.

To be sure, descriptions of the reach of the secondary boycott prohibition are normally couched in terms of union conduct emanating from a primary "labor dispute," since this is the typical situation in which section 8(b)(4) is, and was meant to be, applied. For example, the Supreme Court has said that enactment of the section was prompted by "[c]ongressional concern over the involvement of third parties in *labor disputes not their own.*" *NLRB v. Local 825, International Union of Operating Engineers*, 400 U.S. 297, 302, 91 S.Ct. 402, 406, 27 L.Ed.2d 398 (1971) (emphasis added). However, this language does not suggest that it is permissible under section 8(b)(4) for a union to direct pressure against a neutral employer in order to satisfy objectives unrelated to any "labor dispute" at all. Such an interpretation would be contrary to the congressional purpose behind the section, and we reject it. *Cf. National Maritime Union v. NLRB*, 342 F.2d 538 (2d Cir.), *cert. de-*

7. The fact that the ILA did not engage in more extensive forms of coercion—*e. g.*, picketing or a total boycott of employers trading with Russia or handling Russian cargo—does not dictate the conclusion that its limited boycott had no proscribed object. *See NLRB v. Twin City Car-*

*penters District Council*, 422 F.2d 309, 315 (8th Cir. 1970); *Local 5, United Ass'n of Journeymen v. NLRB*, 321 F.2d 366, 370 (D.C.Cir.), *cert. denied*, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963).

*nied,* 382 U.S. 835, 86 S.Ct. 78, 15 L.Ed.2d 78 (1965); *National Maritime Union v. NLRB,* 346 F.2d 411, 416–20 (D.C.Cir.), *cert. denied,* 382 U.S. 840, 86 S.Ct. 90, 15 L.Ed.2d 82 (1965); *NLRB v. Twin City Carpenters District Council,* 422 F.2d 309, 312–13 (8th Cir. 1970); *NLRB v. Local No. 751, Carpenters,* 285 F.2d 633, 639 & n.6 (9th Cir. 1960).

We think it more rather than less objectionable that a national labor union has chosen to marshal against neutral parties the considerable powers derived by its locals and itself under the federal labor laws in aid of a random political objective far removed from what has traditionally been thought to be the realm of legitimate union activity. *Cf. NLRB v. Washington-Oregon Shingle Weavers' District Council,* 211 F.2d 149, 152 (9th Cir. 1954) (boycott ordered "not because of any dispute, but merely because the union dislikes the producer for any reason, or for no reason, . . . would appear even more reprehensible"). The labor laws do not confer upon bargaining representatives a voice in the conduct of foreign policy. The fact that there have been few, if any, cases that have applied the secondary boycott provisions to activity motivated by a "purely political dispute"[8] illustrates little more than the rarity with which labor unions have seen fit to engage in this sort of "political strike" conduct. The language of section 8(b)(4) and the congressional objectives that prompted its enactment point to no reason why the section should not prohibit such secondary pressure, for whatever reasons motivated. The potential danger of uncontrolled, whimsical activity is obvious. It must be remembered that a union's ability to apply crippling secondary pressure is greatly enhanced by its position under the federal labor laws; without even the justification of a labor-oriented motive, such forbidden secondary activity is a *fortiori* precluded.[9]

Likewise, we reject the view, apparently adopted by the district court, that section 8(b)(4) may not be applied to national boycotts undertaken as a form of "political expression." To our knowledge, the only other precedent that would support such a sweeping proposition is *NLRB v. ILA (Ocean Shipping Services),* 332 F.2d 992 (4th Cir. 1964), which involved the ILA's refusal, during the height of the Cuban missile crisis in 1962, to load ships that were trading or had traded with Cuba. The court decided the case on the ground that the NLRB lacked jurisdiction over the dispute, but "deem[ed] it appropriate to consider further" whether an unfair labor practice had been alleged. The court then suggested that a politically motivated and selective boycott would not violate section 8(b)(4) because "if the bare refusal to work in the circumstances shown should be held illegal, the union would be deprived of its right of expression and the proviso of section 8(b)(4)(ii)(B) would be emptied of meaning." *Id.,* at 997.

◼ We cannot agree that prohibiting the ILA from ordering employees not to handle Russian goods would rob either the ILA or its members of their "right of expression." (Nor can we understand why, in any event, the proviso of section 8(b)(4)(ii)(B) would thereby "be emptied of meaning"; this proviso protects only a "primary strike or primary picketing.") Certainly the union and its members have numerous alternative forms of "expression" left to them, including the right to assemble

---

**8.** *But cf.* the decision of the NLRB in *Local 1355, ILA and Ocean Shipping Service, Ltd.,* 146 NLRB 723 (1964), *reversed* by the Fourth Circuit in *NLRB v. ILA,* 332 F.2d 992 (4th Cir. 1964), discussed *infra.*

**9.** The district court also characterized the ILA action as "a primary boycott of Russian goods, with incidental effects upon those employers who deal in such goods." 488 F.Supp. at 531. Clearly this is not the case. The ILA boycott does not differ in this regard from innumerable refusals to handle "hot cargo" that have been held to be prohibited secondary activity, *e. g., NLRB v. Local 3, Int'l Bhd. of Electrical Workers,* 477 F.2d 260 (2d Cir.), *cert. denied,* 414 U.S. 1065, 94 S.Ct. 572, 38 L.Ed.2d 470 (1973); *NLRB v. Wine Workers Union Local 1,* 178 F.2d 584 (2d Cir. 1949); and cases cited at page 1375 *supra.* These cases might likewise have been described as boycotts of a primary employer's "goods" with "incidental effects" on the secondary employers that dealt with the goods.

or leaflet in protest of Russian aggression and the right to petition and lobby elected representatives in pursuit of a reassessment of United States foreign policy regarding American-Russian trade.[10] By resorting to coercive tactics against neutral parties, the union has exceeded the bounds of "political expression" in its pure form; indeed, the sort of union-directed work stoppage at issue here is much farther removed from "pure" expression than the peaceful picketing that has been found to violate section 8(b)(4) in numerous cases.[11] *E. g., N.L.R.B. v. Retail Store Employees Union, Local 1001, supra,* 447 U.S. 607, 100 S.Ct. 2372, 65 L.Ed.2d 377. *International Brotherhood of Electrical Workers v. NLRB,* 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951). For this reason we also reject ILA's argument that its concerted conduct, carried out on orders of top union management, is protected by the first amendment. *See also American Radio Association v. Mobile Steamship Association,* 419 U.S. 215, 229–31, 95 S.Ct. 409, 417–419, 42 L.Ed.2d 399 (1974); *Teamsters Union v. Vogt, Inc.,* 354 U.S. 284, 77 S.Ct. 1423, 1 L.Ed.2d 1347 (1957).

■ In conclusion, we hold that Allied has alleged a violation of NLRA section 8(b)(4). We therefore vacate the district court's dismissal of Count I of the complaint, and remand for further consideration of Allied's prayer for damages and preliminary and permanent injunctive relief.

## Sherman Act

We next proceed to whether or not the ILA boycott amounts to a violation of section 1 of the Sherman Act. As such a violation would entitle Allied to treble damages, this issue is not mooted by our holding that a cause of action exists under the NLRA. We first consider whether the union's activity falls within the statutory "labor exemption" from the antitrust laws. Clayton Act §§ 6 & 20, 15 U.S.C. § 17 and 29 U.S.C. § 52; Norris-LaGuardia Act, 29 U.S.C. §§ 101–15. In *United States v. Hutcheson,* 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), the Supreme Court held that, in light of these statutory provisions, the Sherman Act does not proscribe union activity "so long as [the] union acts in its self-interest and does not combine with non-labor groups." *Id.,* at 232, 61 S.Ct. at 466. This standard, which has been referred to as the "two-prong test," has been developed in a series of Supreme Court cases. *E. g., Allen Bradley Co. v. Local 3, International Brotherhood of Electrical Workers,* 325 U.S. 797, 65 S.Ct. 1533, 89

---

**10.** In response to the Soviet invasion of Afghanistan, the United States government placed certain restrictions on exports to the USSR but did not impose any restrictions that would limit the importation of Russian wood products. *See generally* President's Message on the State of the Union, 126 Cong.Rec.H. 20, *reprinted in* [1980] U.S.Code Cong. & Ad.News 112–13.

**11.** We also note that the ILA directive orders *all* ILA members to "express themselves" in a manner that may well be contrary to the views of some. *See Hampton Roads Shipping Ass'n v. ILA,* Civ.No. 80–186–N (E.D.Va. March 1980), slip op. at 10 ("the Union's position that its action constitute [sic] only the joint expression of its members' opinion ... is neither factually nor legally supportable. No evidence of a mandate from the Union's membership has been presented, nor did the Union make any effort to notify its members or employees that Union members who wished to work or who did not support this action could ignore the Union's order without fear of retaliation.") *rev'd on other grounds,* 631 F.2d 282 (4th Cir.

1980). *Cf. Abood v. Detroit Board of Educ.,* 431 U.S. 209, 234–36, 97 S.Ct. 1782, 1799–1800, 52 L.Ed.2d 261 (union may not finance "expression of political views, on behalf of candidates, or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representative" through assessments paid by employees who object to advancing such ideas). Whatever the rights of individual ILA members to refuse work as an act of conscience—an issue we need not decide—the ILA directive went considerably beyond anything necessary to enable these members to assert such a right. *See Truck Drivers & Helpers Local 728,* 119 NLRB 399, 407 (1957) ("what is here involved is not an assertion of individual right by individuals, but rather formulation and enforcement by the Respondent Union as a labor organization ... of a collective policy or program"). *See also NLRB v. Local 74, United Bhd. of Carpenters,* 341 U.S. 707, 713, 71 S.Ct. 966, 970, 95 L.Ed. 1309 (1951).

L.Ed. 1939 (1945); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *American Federation of Musicians v. Carroll,* 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968); *Connell Construction Co. v. Plumbers Local 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975).

■ While "the test to determine if a union's actions are in its 'self-interest' has not been precisely formulated," the principle that emerges from the above cases is that activities are in the self-interest of a labor organization "if they bear a reasonable relationship to a legitimate union interest." *Adams, Ray & Rosenberg v. William Morris Agency,* 411 F.Supp. 403, 410 (C.D. Cal.1976). In particular, the labor exemption has been applied when the union acts to protect the wages, hours of employment, or other working conditions of its member-employees, objectives that are at the heart of national labor policy. We think the district court was correct in concluding that the ILA's "political dispute" with the Soviet Union does not relate to a "legitimate union interest" as that term has been defined in American labor history and law, and thus that the ILA boycott is not immunized by statute from operation of the antitrust laws.[12]

The question still remains whether the ILA's refusal to handle Russian-made goods is the sort of activity which the Sherman Act was intended to proscribe. Allied seeks to characterize the boycott as a "concerted refusal to deal," and, in a literal sense, it is. On the other hand, there are significant differences between the activity at issue in this case and the sorts of "concerted refusals to deal" that have been found per se unlawful under the Sherman Act.

The classic anticompetitive "group boycott" is a concerted action by competitors at one level to protect themselves from competition by non-group members who seek to compete at that level. Sullivan, *Handbook of the Law of Antitrust* 230, 261–62 (1977). *See, e. g. Fashion Originators Guild v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Eastern States Retail Lumber Dealers' Association v. United States,* 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). While many of the boycotts that have been found per se illegal have involved the participation of suppliers or customers of the boycotted firm, *e. g., Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), "it is [the] purpose to exclude competition that has characterized the Supreme Court's decisions invoking the group boycott per se rule." *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1178 (D.C.Cir.1978). There is no allegation here that the ILA is engaged in an effort to drive Allied out of business or, indeed, that the ILA has any economic or commercial objective in pursuing the boycott of Russian goods.

It is not the motivation for the boycott alone that distinguishes this case from the paradigmatic anticompetitive refusal to deal, but also its scope. ILA members are not refusing to handle any and all goods imported by Allied, in retaliation for Allied's dealings with the Russians. *Cf. Missouri v. National Organization for Women, Inc.,* 620 F.2d 1301 (8th Cir. 1980) (politically motivated boycott of all convention facilities in states that had not ratified proposed equal rights amendment). ILA members have refrained from boycotting any ships not involved in trade with the Soviet Union, including ships owned by carriers which maintain Russian trade elsewhere. The limited scope of the boycott, while it does not immunize the conduct from antitrust scrutiny, is relevant to the question of the significance of the action's anticompetitive purpose or effect.

■ We think this limited refusal to handle goods, undertaken as a political protest by a labor union acting on its own, and ill-designed as a means of gaining a competitive or commercial advantage for the union or its members, is not the sort of evil at which the Sherman Act is aimed. The Sherman Act was a product of "the era of 'trusts' and of 'combinations' of businesses

**12.** There is no real indication that the ILA "conspired" with any non-union group.

and of capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern." *Apex Hosiery v. Leader,* 310 U.S. 469, 492–493, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940). The Supreme Court has said that "the Act is aimed primarily at combinations having commercial objectives and is applied only to a limited extent to organizations, like labor unions, which normally have other objectives." *Klor's, Inc. v. Broadway-Hale Stores, Inc., supra,* 359 U.S. at 213 n.7, 79 S.Ct. at 710 n.7. While we have rejected appellees' claim that the boycott falls within the statutory exemption from the antitrust laws, we nevertheless think that it would be a rare case when, absent a specific anticompetitive object or collaboration with non-labor groups, a mere refusal to work by members of a labor union, even though the result of concerted action, would be held to violate the Sherman Act. *See Hunt v. Crumboch,* 325 U.S. 821, 824, 65 S.Ct. 1545, 1547, 89 L.Ed. 1954 (1944) ("It is not a violation of the Sherman Act for laborers in combination to refuse to work"); *Apex Hosiery, supra,* 310 U.S. at 500–504, 60 S.Ct. at 996–998. We hold that the ILA activity at issue here is not sufficient to warrant application of the antitrust laws. *Cf. Marjorie Webster Junior College v. Middle States Association of Colleges and Secondary Schools, Inc.,* 432 F.2d 650, 654 (D.C.Cir.), *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970).

This conclusion is fortified, though not compelled, by our finding, *supra,* that the facts alleged make out a violation of LMRA § 303(a), 29 U.S.C. § 187(a). While the prohibitions of labor law and antitrust law overlap to some degree, it has been said that, in general, "§ 303 was enacted as an alternative to subjecting unions to antitrust liability for secondary activities" amounting to a violation of section 8(b)(4) of the Act. *Mead v. Retail Clerks International Association, Local 839,* 523 F.2d 1371, 1376 (9th Cir. 1975). *Cf. Connell Construction Co. v. Plumbers Local 100,* 421 U.S. 616, 634–35, 95 S.Ct. 1830, 1840–1841, 44 L.Ed.2d 418

(1975); *id.,* at 646, 95 S.Ct. at 1846–1847 (Stewart, J., dissenting).

*Admiralty Tort*

Finally, we turn to the claim of tort liability. Allied contends that the ILA boycott wrongfully interfered with its "existing and prospectively advantageous business relationships" and that this amounted to tortious conduct said to be cognizable in admiralty because of its relationship to maritime service, commerce and navigation. *See Carroll v. Protection Maritime Insurance Co., Ltd.,* 512 F.2d 4 (1st Cir. 1975). In light of our conclusion that Allied has alleged a violation of LMRA section 303 based on the same facts, we think the claim in tort, whether governed by federal maritime or state common law, cannot stand.

The Supreme Court has held that section 303 displaces state law in private damage actions based on peaceful union secondary activity. *Local 20, Teamsters Union v. Morton,* 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964); *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1958). We think the rationale behind these cases suggests that in enacting section 303 Congress also meant to supersede any federal common law that might upset the balance carefully drawn between the rights of management and labor in national labor policy. In *Local 20, Teamsters Union v. Morton, supra,* 377 U.S. at 261, 84 S.Ct. at 1259, the Court said that the area of secondary boycotts is one "of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law *having its source in those statutes,* rather than by local law" (quoting *Sola Electric Co. v. Jefferson Electric Co.,* 317 U.S. 173, 176, 63 S.Ct. 172, 174, 87 L.Ed. 165 (1942) (emphasis added)). In this context, an admiralty action sounding in tort would function simply as a substitute for "local law," applicable to tortious acts having a sufficient nexus to maritime commerce. No reasons are advanced why such an action should survive enactment of the

federal labor laws whereas a similar state action would not. *See Navios Corp. v. National Maritime Union*, 236 F.Supp. 657 (E.D.Pa.1964), aff'd, 359 F.2d 853 (3d Cir.), cert. denied, 385 U.S. 900, 87 S.Ct. 205, 17 L.Ed.2d 132 (1966). We hold therefore that the district court properly dismissed Count III of the complaint.

*Reversed and remanded.*

ALDRICH, Senior Circuit Judge (concurring and dissenting).

While I agree with part of the court's thorough opinion, and with the conclusion that plaintiff is entitled to relief, I feel more comfortable with a different route. For the reasons given by the court I agree that this is not a Sherman Act case. I have doubts, however, whether relief is within the reach of the NLRA.

By my reading, the *Benz* line of cases cited by the court establishes the general proposition that the NLRA does not reach, directly or indirectly, labor controversies in which the "primary" dispute relates to the internal affairs of a foreign entity (in those cases, foreign shipowners). *See American Radio Ass'n v. Mobile Steamship Ass'n*, 1974, 419 U.S. 215, 221–26 (*Mobile*); *Windward Shipping (London) Ltd. v. American Radio Ass'n*, 1974, 415 U.S. 104, 109–13, 94 S.Ct. 959, 962–964, 39 L.Ed.2d 195 (*Windward*) and cases cited. The one exception is where the primary dispute centers around the foreign entity's employment relations with American labor. *See ILA, Local 1416 v. Ariadne Shipping Co.*, 1970, 397 U.S. 195, 90 S.Ct. 872, 25 L.Ed.2d 218. This distinction, while couched in terms of whether or not the dispute is "in" or "affecting commerce," stems more basically from the recognition that Congress, in passing legislation to govern domestic labor relations, "simply did not intend . . . to erase longstanding principles of comity and accommodation in international maritime trade." *Windward*, ante, 415 U.S. at 112–13, 94 S.Ct. at 964.

If I understand it correctly, the court is willing to extend the NLRA to cover the present, secondary, dispute because the result reached "would portend no interference in the management or affairs of foreign companies, workers, or labor organization;" indeed, will doubtless avert it. With due respect, I cannot agree. Either an act of Congress covers a particular dispute or it does not; the determination should not depend on the desirability of the ultimate result reached. It is, moreover, happenstance that the court can take this approach. Prior to the Taft-Hartley Act, the labor laws were held to protect secondary boycotts. *United States v. Hutcheson*, 1941, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788. To say that defendants' conduct is a labor matter would then have meant it protected, with the inevitable effect upon the primary dispute. I cannot believe that we would then, given the proposition that the primary dispute involved longstanding principles of comity and accommodation in international maritime trade that Congress did not intend to erase, *Windward*, ante, have extended the act's protection to a secondary boycott designed very significantly to affect it. Equally, I do not believe that the fact that Congress came to have a broader general view of the labor injunction should be taken to evince an intent for the NLRA to partake in international decisions.

Continuing with *Windward* and *Mobile*, these cases arose out of picketing of foreign-flag vessels by six American maritime unions in order to draw attention to the low wages paid by the vessels to their (foreign) crews—and the consequent competitive disadvantage of American shipping, which had to pay union scale. Longshoremen and other dock workers refused to cross the picket lines to load and unload the ships. Suit was brought, in the state courts,[1] by the foreign owners of two of the ships (*Windward*) and by American stevedores and an American shipper whose crops were waiting to be loaded (*Mobile*). In each case the unions sought to defeat the state court's jurisdic-

---

1. *Windward* and *Mobile* were separate suits, in the courts of Texas and Alabama, respectively, arising out of factually identical activities by the unions in Houston and Mobile.

tion as preempted by the NLRA. In *Windward*, the Supreme Court rejected the unions' contention that their activity was covered by the Act, and protected by section 7. In *Mobile*, the unions argued that whatever the case in a suit by the foreign shipowners, their activities *vis-a-vis* the American stevedores and shipper were governed by the NLRA, since they were arguably a secondary boycott prohibited by section 8(b)(4), which declares it an unfair labor practice for a labor organization or its agents

> "(1) to engage in, or to induce or encourage any individual employed by any person engaged in commerce ... to engage in, ... a refusal in the course of his employment to ... handle ... any goods ... where ... an object thereof is—
>
> .　　.　　.　　.　　.
>
> "(B) forcing or requiring any person ... to cease doing business with any other person ...."

In rejecting this argument, the Court referred to its earlier holding in *Windward* that the picketing, insofar as it was designed to influence the foreign shippers' internal affairs, was not activity "affecting commerce," and stated

> "it would be wholly inconsistent to now hold, insofar as concerns Board jurisdiction over a complaint by respondents, that the employer of the longshoremen who honored the picket line, or the shipper whose goods they did not handle, was in or affecting commerce." 419 U.S. at 224, 95 S.Ct. at 415.

Stating it differently, the Court rejected "the proposition that a secondary employer's domestic business activities may be the basis for Board jurisdiction where the primary dispute is beyond its *statutory* authority over unfair labor practices 'affecting commerce,'" (emphasis in orig.) 419 U.S. at 226, 95 S.Ct. at 416, and held the propriety, vel non, of the picketing not an NLRA matter.

*Mobile*, then, looks to the primary dispute: if this is beyond the Board's reach as not "affecting commerce," then so are secondary activities designed to influence its outcome. While this last may be semanti-

cally troublesome, it is fully consistent with the notion that the internal management or affairs of foreign entities are none of the Board's business, directly or indirectly. I therefore ascribe less importance than does the court to the *Mobile* Court's dictum that its holding "need cast no doubt on" the *Madden* and *Grain Elevator Workers* cases. 419 U.S. at 225 n.10, 95 S.Ct. at 415 n.10. To my mind, *Mobile* casts considerable doubt on them. The only analytically significant distinction between these two cases and *Mobile* is that the former involved an actual work stoppage to force the secondary employer not to deal with the primary, while the *Mobile* defendants induced such action by their secondary picketing. Where section 8(b)(4)(i) applies, it declares unlawful the engaging in, *or* the inducement or encouragement of, a secondary boycott. It is difficult to see how one affects "commerce" more than the other.

To summarize, it seems to me that in looking at the Act clause by clause, instead of as a whole, the court has adopted the approach of the *Mobile* dissent where, again, it was said that "following the literal language of § 8(b)(4)(B) and recognizing the Board's exclusive jurisdiction over the dispute would not in any way undermine the principles of comity emphasized in our decision in *Windward Shipping*." 419 U.S., ante, at 241–42, 95 S.Ct. at 423. That approach did not prevail in *Mobile*, and I would not follow it here. Accordingly I would hold that just as state court, rather than NLRA, jurisdiction existed in *Mobile*, plaintiff must look to our admiralty jurisdiction in the case at bar.

Nor do I find that wanting; the facts in the present case bear an intimate "relationship ... to traditional maritime activity." *Executive Jet Aviation, Inc. v. Cleveland*, 1972, 409 U.S. 249, 261, 93 S.Ct. 493, 501, 34 L.Ed.2d 454. *See Pino v. Protection Maritime Ins. Co.*, 1 Cir., 1979, 599 F.2d 10, 12–13, *cert. denied*, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136; *Carroll v. Protection Maritime Ins. Co.*, 1 Cir., 1975, 512 F.2d 4, 6–9 and cases cited, particularly *O'Connor & Co. v. Pascagoula*, S.D.Miss., 1969, 304

F.Supp. 681; *Orient Mid-East Lines, Inc. v. Albert E. Bowen, Inc.*, S.D.N.Y., 1966, 255 F.Supp. 627; *Upper Lakes Shipping, Ltd. v. ILA*, S.D.N.Y., 1963, 33 F.R.D. 348. Having concluded that this action is not preempted by the NLRA, I would hold that Allied has properly alleged the elements of maritime tort for interference with its contractual relations.

Section 766A of the Restatement (Second) of Torts reads:

"§ 766A. *Intentional Interference With Another's Performance of His Own Contract*

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

Most of the requisite elements are easily found in the case at bar and require little discussion. Contrary to ILA's assertion, malice in the sense of ill will need not be shown; intent (knowledge to a substantial certainty) is ordinarily enough. In the case of a remote interference, *see post*, the "motive or purpose" to interfere may be required. *See* Restatement, ante, § 766 comments j, r, s; § 766A comment e; § 767 comment d. However, it is reasonably clear that the ILA's purpose here was to prevent the loading and unloading of Russian and Russia-bound cargos—stated differently, to disrupt Soviet-American trade, of which Allied's contract represented a portion—and while the only ill will may have been directed toward the Soviet Union, the target of the boycott was this trade and, necessarily, this and other contracts. Allied has credibly alleged that it was prevented from or burdened in performing its contract,[2] and has suffered pecuniary loss.[3]

A number of factors persuade me that the ILA's interference was "improper" within the meaning of section 766A.[4] Labor unions, under the protective wing of federal law, have achieved tremendous social and economic power. This is balanced, in labor controversies "in commerce," by protections given management and others—notably, the prohibitions of section 8(b). My conclusion that the secondary boycott provisions of section 8(b)(4) do not apply in no way detracts from the soundness of the general policy, embodied therein, of "shielding unoffending employers and others from pressures in controversies not their own." *NLRB v. Denver Building & Constr. Trades Council*, 1951, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284. As the court observes, a labor organization's secondary activity in pursuit of a political goal in no way related to the labor interests of its members may be thought doubly objectionable.

I am further influenced by the same "considerations of comity and accommodation in international trade" which argue against NLRA coverage. The ILA has sought ultimately to involve itself in the affairs of a foreign nation—a matter, in my opinion, better entrusted to the State Department than to labor unions. Union activity which unduly interferes with the non-"commerce" policies of a foreign entity is

2. The complaint recites that the contract under which the February shipment was made ran out on December 31, 1979, and that a new contract was under negotiation. If Allied has been hampered in the latter, Restatement § 766B (intentional interference with prospective contractual relation) might become relevant.

3. Damages may include lost profits as well as consequential losses. Restatement, ante, § 774A.

4. Restatement § 767 presents a (nonexhaustive, *see* comment b) list of factors to be considered:

"(a) the nature of the actor's conduct,
(b) the actor's motive,
(c) the interests of the other with which the actor's conduct interferes,
(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference and
(g) the relations between the parties."

denied the protections of the NLRA, because such an intervention would be "likely to 'raise considerable disturbance not only in the field of maritime law but in our international relations as well.'" *Ariadne*, ante, 397 U.S. at 198, 90 S.Ct. at 873, quoting *McCulloch v. Sociedad Nacional de Marineros*, 1963, 372 U.S. 10, 19, 83 S.Ct. 671, 676, 9 L.Ed.2d 547. The protection of this interest alone might strain the limits of Allied's standing and this court's power. However, where we are asked to consider the propriety or impropriety of an injury done to a plaintiff properly before us, this concern diminishes "the social interest in protecting the freedom of action of the actor." Restatement, ante, § 767(c).

The ILA's argument that its boycott is too remote in its effect on Allied to be actionable is undercut by the fact that disruption of Soviet-American trade, of which Allied's business was a part, was not only a predictable and intended consequence of the boycott; it was the primary purpose behind it.[5] In such a case, "remoteness" of the type here is not a bar to recovery. *See* Restatement, ante, § 767 comment h.

Finally, I agree with the court's assessment of the ILA's First Amendment claim. While action may in some cases speak louder than words and receive similar protection, *see Spence v. Washington*, 1974, 418 U.S. 405, 409–10, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (per curiam), at some point the concrete injury inflicted on others overshadows the expressive content inherent in the act. If the First Amendment does not protect the inducement of a secondary boycott by picketing, *NLRB v. Retail Store Employees Union, Local 1001*, 447 U.S. 607, 612–616, 100 S.Ct. 2372, 2376–2378, 65 L.Ed.2d 377 (1980), I do not see how it protects the boycott itself.

I would affirm the district court's dismissal of the NLRA and Sherman Act claims, and reverse its dismissal of the tort claim.

---

5. This fact adequately distinguishes the ILA's cited cases of *Isbrandtsen Co. v. Local 1291, ILA*, 3 Cir., 1953, 204 F.2d 495 and *R. J. Caldwell Co. v. Fisk Rubber Co.*, 1 Cir., 1933, 62 F.2d 475.